THE CHATTANOOGA, ROME AND COLUMBUS RAILROAD COMPANY *v.* LIDDELL *et al.*

1. In an action for damages against a railroad company, the admission of testimony, not as an element of damages but in the nature of an index to the pain and suffering of the plaintiff, that the injuries required the administration of opiates to her and she was thus acquiring the opium habit, that she had great pleasure in her household duties but has not and never will have that pleasure again, and that from the effects of the nervous prostration resulting from the injury she has not the energy to work or enjoy society, was not erroneous.

2. Sayings of the president of the construction company which was building and equipping the railroad, made two or three hours after the accident occurred, at another place, to a newspaper reporter, that it would be to his interest not to publish too much, that the railroad at the place of the accident had been laid only temporarily, that he had not had time to put the broad gauge ties on it, and did not want public opinion so strong against him, etc, were not admissible.

3. Where the contract between the railroad and construction companies provided that the latter should operate the railroad so as to be completed and equipped, for two years, and should receive its earnings, the railroad company was liable for injuries occurring by the negligence of the construction company during that period; such operation being by virtue of the franchise of the railroad company, and with its knowledge and sanction.

4. Certain charges complained of, taken in connection with the whole charge, are not erroneous.

5. In an action against a railroad company for damages to a passenger from the derailing of the coach on a defective track, it was error to charge the jury that if the evidence disclosed, from all the facts submitted, that the company was grossly negligent, the plaintiff would be entitled to recover " what we call punitive damages, to punish them for that negligence "; the evidence of negligence not being sufficient to authorize a charge on punitive damages, or if so, such damages being given not as a punishment but to deter the wrong-doer from repeating the trespass.

6. From the whole charge it appears that the court's instruction to the jury that the injuries are permanent and that the plaintiff will have to suffer the remainder of her life, the word " if " being omitted, was a *lapsus linguæ.*

May 7, 1890.

Damages.   Railroads.   Evidence.   Negligence.   *Res gestæ.*   Contracts.   Corporations.   Charge of court. Practice.   Before Judge MADDOX.   Floyd superior court. September adjourned term, 1889.

On August 5, 1887, the railroad company entered into a contract with Hillman, providing among other things that Hillman and his successors and assigns should build and equip a standard gauge railroad from Chattanooga, Tennessee, to Rome, Georgia, and from Cedartown to Carrollton, Georgia, and should change the gauge of the company's railroad between Rome and Carrollton from a narrow to a standard gauge, and supply for the railroad all rolling-stock and other material; for which the railroad company were to pay specified considerations.   It was further agreed that Hillman and his successors and assigns should operate the railroad so as to be completed and equipped, for and during the time of two years after the date of the contract,

and pay off the floating debt of the company and the interest of the first mortgage bonds for the term of two years from this date; and that all the earnings of the road for two years and all the expenses of operating it should go to Hillman and his assigns. This contract was transferred to the Rome and Carrollton Construction Company, and the railroad was built and operated under it. On October 31, 1887, while the railroad was being operated by the construction company, Mrs. Liddell was a passenger on one of its trains running from Cedartown to Rome. When within about two or three miles of the latter city, the coach in which she was sitting became derailed and fell from a trestle, injuring her with others. She and her husband brought suit against both the railroad and construction companies for damages, alleging that the injury was sustained on account of the gross carelessness and negligence of the defendants in operating the railroad, and by the defective, improper and worn out rails, machinery, tracks and coaches which were being used. The declaration further alleges that Mrs. Liddell was injured in her spine and received contusions on her left hip and knee, besides other bruises and injuries, causing her great pain and suffering; whereby she was confined to bed for two months, and still suffers from her injuries, her whole nervous system being deranged and weakened by them, and they being permanent.

The defendants pleaded the general issue. By amendment, the plaintiffs afterwards struck the construction company· from the declaration and proceeded against the railroad company alone. Whereupon the railroad company pleaded that at the time of the injury the railroad was not in its possession or control, but in that of the construction company for the purpose of building and equipping for the railroad company a standard gauge railroad from Chattanooga to Carrollton.

The evidence introduced at the trial tended to show that the plaintiff suffered the injuries alleged and that they would probably be permanent; that the pain she endured, and had never ceased to endure since the accident, was extreme; that her nervous system was shattered, and she was rendered almost unfit for labor, of which before the accident she was accustomed to perform a large amount with enjoyment; that she was twenty-seven years old at the time of the accident; and that though she received the best possible medical treatment, her suffering and the other results of the injuries she received will continue through her life. The train was derailed by the spreading of the track. The crossties were of the length used in the narrow gauge track, and the track had but recently been changed from a narrow to a broad gauge. The spikes which held the iron rails to the cross-ties were driven in near the ends of the ties, some of them so close as to be forced through the ends of the ties, as was discovered after the accident. On one side of track the ties appeared as if no spikes had been driven into them. The track was somewhat curved on approaching the trestle, and on examination it was found that the outside of the curve was not as much higher than the inside as is usual on a railroad track. The train was not running rapidly but only about twelve miles an hour, and the coach left the track thirty or forty feet before reaching the trestle, which was twenty-four feet high, and on which it rolled for some distance before falling off. It was a narrow gauge coach, placed upon broad gauge freight trucks, which had no spring bolsters as ordinary passenger-coach trucks have. Generally, what are called safety-chains, extending from the corner of the coach to the trucks to keep the truck from slewing in case it gets off the track, are used on passenger-coaches, but there were none on this coach; and there was testimony that the attention of

some of the company's servants was called to this when the coach was put in use, four or five days before the accident, and that the car-inspector said he could not put on safety-chains unless he had them—that it was the best he could do, and it was safe; and after the accident he said it was as safe as he could make it with the material that had been furnished him to build the car with.   The bolt used to fasten the car to the trucks was a narrow gauge bolt.   The conductor of the train testified that it was safe to run over the track at that time at the rate of fifteen miles per hour, and that he examined the train before leaving Cedartown, and had he known there was anything unsafe he would not have taken any risk on it.   J. D. Williamson was president of the construction company and acted as such, but was not an officer, director or agent of the railroad company.   Every stockholder in the construction company has stock in the railroad company, but there are stockholders in the railroad company who are not stockholders in the construction company.   After the gauge between Rome and Cedartown was broadened, the construction company ran trains and carried passengers on it, selling tickets and having a schedule; and it was generally understood that it was building and operating the road.   If it was run in a dangerous condition, it was without the consent of the railroad company, though no particular action was taken or protest made on its part; and nothing was done to put the public on notice that the road was unsafe for passengers or that the railroad company was not responsible to them.   The train had three loaded freight-cars in advance of the passenger-coach.   It was quickly stopped.   The engineer was a careful man; and there were three brakemen.

The jury found for the plaintiff $10,000.   The defendant moved for a new trial on the grounds stated in the opinion.   The motion was overruled, and exception was taken.

DABNEY & FOUCHÉ, for plaintiff in error.

DEAN & SMITH, *contra.*

SIMMONS, Justice.

As this case is to be sent back for a new trial, we will not discuss the first three grounds of the motion, to wit, that the verdict is contrary to the evidence, to law, etc. The fourth ground of the motion was not insisted upon here.

1. The fifth, sixth and eighth grounds of the motion complain that the court permitted a witness to testify that the plaintiff's nervous prostration had a weakening effect upon her system; that this injury had required the administration of opiates, and that the plaintiff was acquiring the opium habit as a result of this trouble by reason of the administration of opiates; that the plaintiff had great pleasure in her household duties, but she does not take that pleasure now, and she never will; and that from the effects of this nervous prostration she has not got the energy to work or to enjoy society, etc. Judging from the charge of the court, which is in the record, this evidence, and some other of like character, was admitted, not as an element of damage, but somewhat in the nature of an index to the pain and suffering of the plaintiff. Being admitted for that purpose, we cannot say it was error. *Powell* v. *Augusta & Summerville R. R. Co.*, 77 *Ga.* 192; Tex. Mex. Ry. Co. *v.* Douglass, 11 S. W. Rep. 333.

2. The ninth ground of the motion complains that the court permitted a witness for the plaintiff to testify as follows: "Mr. J. D. Williamson came to where Mr. Outz and I were talking about the road. Mr. Williamson said it would be to his interest not to publish too much. They were speaking about the condition of the railroad, and Mr. Williamson said it was just put there temporarily; that he had not had time to put the broad gauge ties on it, and he did not want public opinion so

strong against him.. He was talking about the hurried condition he had fixed up the road in, and did not want the public opinion too hard against him in the terrible wreck and smashing up people." We think the court erred in admitting this testimony. It was asserted by counsel in the argument before us and not denied that these sayings of Williamson were not made at the time the accident happened, but some two or three hours thereafter. Williamson was the president of the construction company which was building and equipping the road. While it is true that the construction company was operating the road in the transportation of passengers and freight, and while it is true that the railroad company was liable for the acts of the construction company (as we shall hold later on in this opinion), and that Williamson thereby became the agent of the railroad company, we do not think that these admissions made by him, under the circumstances disclosed by this record, were admissible as against the railroad company or the construction company. To make the admissions of an agent admissible as against his principal, they must be a part of the *res gestœ*, or must have been made during the performance of the agent's duties. It is clear that the admissions of Williamson were not made as part of the *res gestœ*. He was not at the place of the accident, and, as said before, it was some two or three hours after the accident when he had the conversation with the newspaper reporter. And it is equally clear that they were not made when in the performance of a duty to the corporation, or while any duty to the corporation was being performed by him. It seems to us to have been more in the nature of an application to the newspaper reporter not to publish too much about the accident in his paper, and more in the interest of Williamson individually than of the

railroad company. In the case of *Wright* v. *Ga R R.
& Bkg., Co.* 34 *Ga.* 330, it was sought to prove that a
brakeman said that the axle of the car which had run
off was two inches too short, and that he had told
the .company so; and this court held that "Beyond
the scope of his agency, an agent cannot, by his
declarations, affect his principal. And as corporate
bodies, especially railroad companies, have daily hun-
dreds of employees in various service, with divisions
of labor and duty, simple justice requires that these
companies shall not be liable for damages upon the
loose or casual sayings of every person who may be
in their employment." In the case of *Griffin* v. *M. & W.
P. R. R. Co.*, 26 *Ga.* 111, this court held that "The
admissions of an agent, not made at the time when
the fact transpires upon which it is sought to charge his
principal, but subsequently, being no part of the *res
gestœ*, should be excluded."

In the case of *Evans & Ragland* v. *Atlanta, &c. R. R.
Co.*, 56 *Ga.* 498, an agent of a railroad made an indorse-
ment on a bill of lading some days after the corn
passed though Atlanta, and this court held that the
endorsement of the agent was not admissible as evi-
dence. On page 500, JACKSON, J., in discussing the
question, says: "If it was the duty of this agent to
investigate how the freight was received, whether in
good or bad order, and to report that fact on the bill of
lading on inquiry by the agent at LaGrange, then we
think this indorsement would be made '*dum fervet
opus*'—in the very work entrusted to him by the com-
pany,—and being so made in the business he was
employed to transact, his sayings or writings, which
are but written statements, would be admissible; but in
the absence of proof that this was in the line of his
business—that it was his duty to investigate and report
thereon,—the written statement on the bill of lading

would be but the sayings of the agent in respect to a past transaction, and would not be admissible. In this case, the record does not disclose any proof that such investigation and report and indorsement was part of the business of this agent, and therefore the indorsement was properly rejected. . . . These Georgia cases and our code confine the admissibility of the sayings of the agent to the business entrusted to him, and *to the time while so employed,* and exclude his sayings as to past transactions. In our State, they are admissible only upon the principle of being part of the *res gestæ.* It is clear, therefore, that the court rejected the indorsement of this agent, and of the other agents, properly, because they spoke or wrote about past transactions, and there was no proof that it was their business to investigate these transactions and write or make statements about them." Mechem, in his work on Agency (714), says: "The statements, representations and admissions of the agent, made in reference to the act which he is authorized to perform and while engaged in its performance, are binding upon the principal in the same manner and to the same extent as the agent's act or contract under like circumstances, and for the same reason. While keeping within the scope of his authority and engaged in its execution, he is the principal, and his statements, representations and admissions in reference to his act are as much the principal's as the act itself. Such statements, representations and admissions are therefore admissible in evidence against the principal in the same manner as if made by the principal himself. But it is obvious from this statement of the rule that not every statement, representation or admission which the agent may choose to make is binding upon the principal. In order to have that effect, the statement or admission must have been made (1) in respect to a

matter within the scope of his authority; . . (2) the statements, representations or admissions must have been made in reference to the subject-matter of his agency; the mere idle, desultory or careless talk of the agent, having no legitimate reference to or bearing upon the business of his principal, cannot be binding upon the latter; and (3) the statements, representations or admissions must have been made by the agent at the time of the transaction, and either while he was actually engaged in the performance, or so soon after as to be in reality a part of the transaction. Or, to use the common expression, they must have been a part of the *res gestæ*. If, on the other hand, they were made before the performance was undertaken, or after it was completed, or while the agent was not engaged in the performance, or after his authority had expired, they are not admissible." As to what is embraced within the *res gestæ*, see section 715 and illustrations. In the case of the Vicksburg & Meridian R. R. *v.* O'Brien, 119 U. S. 99, the court said: "It was, in its essence, the mere narration of a past occurrence, not a part of the *res gestæ*—simply an assertion or representation, in the course of conversation, as to a matter not then pending, and in respect to which his authority as engineer had been fully exerted. It is not to be deemed part of the *res gestæ*, simply because of the brief period intervening between the accident and the making of the declaration. The fact remains that the occurrence had ended when the declaration in question was made, and the engineer was not in the act of doing anything that could possibly affect it. If his declaration had been made the next day after the accident, it would scarcely be claimed that it was admissible evidence against the company. And yet the circumstance that it was made between ten and thirty minutes—an appreciable period of time—after the accident, cannot, upon

principle, make this case an exception to the general rule. If the contrary view should be maintained, it would follow that the declarations of the engineer, if favorable to the company, would have been admissible in its behalf as part of the *res gestæ*, without calling him as a witness—a proposition that will find no support in the law of evidence. The cases have gone far enough in the admission of the subsequent declarations of agents as evidence against their principals." Wood, in his Practice Evidence (section 171), says: "It is a well-settled rule of evidence that the declarations or admissions of an agent will bind the principal in respect to matters about which he was authorized to act for him, if made at the time of the transaction, so as to constitute a part of the *res gestæ*, or in reference to a transaction not yet completed. . . The mere rank or position of the person, as that he is general superintendent, general manager, general agent, etc. of the principal, is not of itself sufficient evidence of his authority to make the admission unless it was made in reference to a transaction in which he participated, and under such circumstances as make it part of the *res gestæ*; consequently, except where made by the agent *as and for* the principal, and with competent authority, in order to be admissible, they must constitute a part of the *res gestæ*." See a full discussion of the subject in this section. But it is claimed by counsel for the defendant in error that this testimony was admissible under the decision in the case of *Krogg v. A. & W. P. R. R.*, 77 *Ga.* 202. While in my opinion that case goes to the extreme limit, yet we do not think it would authorize the admission of the evidence now under consideration. That decision was put expressly upon the ground that the admissions of Gabbett (the superintendent) were part of the *res gestæ* of the transaction, and that they were made while in the performance of a

duty which he owed to the company. And it will be seen from reading that case, that the admissions were made by Gabbett to the engineer while the examination into the cause of the wreck was going on; and the court therefore held them admissible. The court say: "His statements as to the condition of the road were made while in the line of his duty. . . . It was Gabbett's duty to investigate the cause of this disaster, and while he was pursuing his inquiries, actually thus engaged, he made the statement to Krogg already set out. . . . If the agent be in the performance of a duty of the corporation, while thus performing that duty, what he says as to any defect in the construction of the road is res gestæ as to such defect, and his admissions are the admissions of the corporation." It will thus be seen that the facts of that case are very different from the facts in this case. Here, Williamson was not in the performance of any duty which he owed to the company. Nor does it appear that he was investigating the cause of the accident, as Gabbett was. All that appears is that he was asking the newspaper man "not to be too heavy on the railroad." For these reasons, we think the court erred in admitting these statements of Williamson.

3. The tenth ground of the motion complains of the following charge of the court: "In this contract I find this language: 'It is further contracted and agreed that the said C. M. Hillman and his successors and assigns shall operate said railroad so to be completed and equipped, for and during the term of two years from and after this date, and he and they obligate themselves,' and so on. And further on it is stipulated that they are to receive the earnings of the road. I charge you that, under the language of that contract, the defendant in this case would be responsible for any damages that might accrue from the operating of the

railroad, for it is clearly indicated in the contract that they were to operate the road and receive the earnings thereof. Or if I am wrong in that construction of the contract, and if you believe from the evidence the contract was—or if there is any question about that—and it is the duty of the court to construe that contract, and I do construe it to mean that they have the authority to operate this road and carry passengers under and by virtue of the franchise of the Chattanooga, Rome and Columbus · Railroad Company, the defendant in this case ; and if the evidence discloses that they were operating it with their knowledge, and if they didn't put the public on notice that they did not have the right to carry passengers, they would be liable for any injury that might occur by reason of the negligence of the construction company in carrying passengers." We see no error in this part of the charge. The contract between the railroad company and the construction company allowed the construction company to operate the road and to receive its earnings for two years from the time of the making of the contract. In the case of the *M. & A. R. R.* v. *Mayes,* 49 *Ga.* 355, this court held that "Where a railroad company permits other companies or persons to exercise the franchise of running cars drawn by steam over its road, the company owning the road, and to which the law has intrusted the franchise, is liable for any injury done, as though the company owning the road were itself running the cars." See, also, *Singleton* v. *S. W. R. R.,* 70 *Ga.* 464 ; Railroad Co. *v.* Brown, 17 Wal. 450 ; Abbott *v.* Johnstown, etc. R. R. Co., 80 N. Y. 27, s. c. 36 Am. Rep. 572; Lakin *v.* Willamette Valley & Coast R. R. Co., 13 Oreg. 436, s. c. 57 Am. Rep. 25.

4. There was no error in the charges of the court as complained of in the eleventh, twelfth and thirteenth grounds of the motion, when taken in connection with the whole charge.

5. The fourteenth ground of the motion complains that the court erred in charging that " If the evidence discloses, from all the facts that have been submitted to you, that this railroad was grossly negligent, then plaintiff would be entitled to recover what we call punitive damages, to punish them for that negligence; and there is no measure of damages then. It is for you to say, from all the facts and circumstances that surround the case, to what extent you ought to add to your verdict for this plaintiff to punish them." We think the court erred in this charge to the jury. In the case of the Milwaukee, etc. R. R. Co. v. Arms, 91 U. S. 489, the Supreme Court of the United States held : "(1) A passenger in a railway car, who has been injured in a collision caused by the negligence of the employees of the company, is not, as a general rule, entitled in an action against the company to recover damages beyond the limit of compensation for the injury actually sustained. (2) Exemplary damages should not be awarded for such injury, unless it is the result of the wilful misconduct of the employees of the company, or of that reckless indifference to the rights of others which is equivalent to an intentional violation of them." The court, in discussing the question, say: " 'Gross negligence' is a relative term. It is doubtless to be understood as meaning a greater want of care than is implied by the term ' ordinary negligence'; but, after all, it means the absence of the care that was necessary under the circumstances. In this sense the collision in controversy was the result of gross negligence, because the employees of the company did not use the care that was required to avoid the accident. But the absence of this care, whether called gross or ordinary negligence, did not authorize the jury to visit the company with damages beyond the limit of compensation for the injury actually inflicted. To do this, there must have

been some wilful misconduct, or that entire want of care which would raise the presumption of a conscious indifference to consequences. Nothing of this kind can be imputed to the persons in charge of the train; and the court, therefore, misdirected the jury." Wood, in his notes to Addison on Torts (vol. 2, p. 646), says: " In order to warrant a jury in giving vindictive damages, something more than mere unlawfulness must be shown; there must be evidence either of malice, fraud, wantonness or oppression. The act must have been done under such circumstances as show a disregard for the rights of others, or an intention to set at defiance the legal rights of others, or the ordinary obligations of society." Under these rules, which seem to us to be sound, we do not think the evidence of negligence in this case was sufficient to authorize the court to charge the jury that they might find punitive damages. Even if it was, we would still hold, under the rulings of this court, that the charge of the trial judge was erroneous. Code, §3066, says: "In every tort there may be aggravating circumstances, either in the act or the intention, and in that event the jury may give additional damages, *either to deter the wrong-doer from repeating the trespass, or as compensation for the wounded feelings of the plaintiff.*" In the case of *Ratteree* v. *Chapman,* 79 *Ga.* 574, this court held that it was error to charge the jury that they " may give exemplary damages, not only as compensation for the wounded feelings of the plaintiff, but to punish the defendant, and to deter others from the commission of like offences." The judge in the present case charged that exemplary damages might be given as a punishment of the railroad company, while the code says they may be given " to deter the wrong-doer from repeating the trespass." As we said in the *Ratteree* case, " It is best that the law of the case, when expressed in the code, be given as expressed, in

charge to the jury." Under the code, the damages are not given as a punishment, but are given to deter the wrong-doer from repeating the trespass.

6. The fifteenth ground of the motion complains that the court erred in expressing his opinion to the jury that the injury was permanent. It seems that this complaint is well-founded, because the court says: "I charge you again, that these injuries are permanent, and that she will have to suffer the remainder of her life." It appears from a reading of the whole charge that this was a *lapsus linguæ*. The whole charge shows that the judge intended to use the word "if"; so it would read, "I charge you again, that *if* these injuries are permanent," etc. But the charge complained of in this ground of the motion is certified to by the trial judge, so we will simply say that we know he will correct it in his next charge to the jury.

*Judgment reversed.*