GREEN *v.* THE COAST LINE RAILROAD COMPANY *et al.*

1. By invoking equitable relief, such as the appointment of a receiver and the administration of the mortgaged property by equitable means and agencies, mortgagees submit themselves to do equity relatively to any creditor of the mortgagor who may rightly intervene in the foreclosure proceedings in which such relief is sought. Mortgages upon a railway and the income from the same, the mortgagor being left in possession, are, as to the income, whether produced before or after the appointment of a receiver in foreclosure proceedings, subject to be postponed in equity in favor of a claim for damages resulting from a tort committed by the mortgagor while and by reason of operating the railway after the execution of the mortgage. The tort now in question consisting of negligence in running a train upon the railway whereby damages accrued, and judgment therefor against the mortgagor having been obtained before the mortgages were foreclosed or the receiver was appointed, such damages, so reduced to judgment, should be regarded as operating expenses charged by the judgment upon income as against the mortgages and all their incidents.

So long as such a charge is unsatisfied, the mortgages cannot justly and equitably divert income from its payment and take the benefit of such diversion, whether directly or indirectly.

2. In the present case when the court adjudicated finally upon exceptions to the master's report, it was, according to recitals in the bill of exceptions, matter of authentic fact of which the court should have taken judicial notice, that, counting income expended by the receiver for new steel rails, iron and cross-ties, and the sums applied by the court to fees of the receiver and his counsel, about double as much income as would be required to satisfy the judgment for damages had been thus used up while the case was in progress. It is manifest that the mortgagees cannot take all the fruits of the case without incidentally profiting by this income to the detriment of the judgment creditor. For this reason, if for no other, the court erred in approving and sustaining the master's report in so far as it ranked the judgment below the mortgages as a claim upon the fund in court for distribution, that being all the fund there was for distribution, the mortgages being more than sufficient to exhaust it, and the common debtor being insolvent. The court, under the special circumstances, should have ranked the judgment as superior to the mortgages. Let this be done by properly modifying the decree.

3. The evidence taken by a master and duly reported by him to the court appointing him, is a part of the record in that court of the case to which it appertains, and, when specified in the bill of exceptions as material, is properly brought to the Supreme Court in the certified transcript. This being so, the motion to dismiss the writ of error is denied.

October 5, 1895.  Argued at the last term.

Exceptions to master's report.   Before Judge Falligant. Chatham superior court.   June term, 1894.

*R. R. Richards, Charlton Mackall & Anderson* and *W. R. Leaken*, for plaintiff in error.

*G. A. Mercer & Son* and *Saussy & Saussy*, contra.

SIMMONS, Chief Justice.

At my request, concurred in by my associates, ex-Chief Justice Bleckley has assisted the court both in deciding this case and in preparing the opinion. After adoption by the full court, it now appears in his language. The same is true of the head-notes.

The Coast Line Railroad Company executed to trustees two mortgages in the form of trust deeds, the first dated September 1st, 1874, and the second May 1st, 1876. The former was made to secure the payment of bonds amounting to $25,000, maturing September 1st, 1894, issued by the company to raise a fund for use in the construction of a portion of its railway; the latter to secure bonds of the company amounting to $32,000, maturing May 1st, 1886, issued to liquidate the floating debt of the company. Both mortgages covered the franchises, present and prospective, and all the property, real and personal, of the company, both acquired and to be acquired, including expressly all "tolls, income, rents, issues and profits," accruing after any default made in the payment of the bonds themselves or of any interest due thereon. All the bonds bore interest from date, payable semi-annually.

The Coast Line Railroad Company had its origin as a corporation under the name of the Wilmington Railroad Company. Acts of 1868, p. 114. For change of name, see Acts of 1872, p. 375. "Power to borrow not exceeding $25,000, current and lawful money, and issue bonds for the payment of the same," was conferred upon a majority of the directors by an amendment to the charter. Acts of 1874, p. 312. The first mortgage was made to secure these bonds, and there was no statutory authority for making it except the general provision relating to mortgages, contained in section 1954 of the code, which reads as follows: "A mortgage in this State is only a security for a debt, and passes no title. It may embrace all property in possession, or to which the mortgagor has the right of possession at the time, or may cover a stock of goods, or other things in bulk but changing in specifics, in which case the lien is lost on all articles disposed of by the mortgagor up to the time of foreclosure, and attaches on the purchases made to supply their place." Before the second mortgage was executed, power was conferred upon the company to issue bonds, not to exceed the

v 97-2

sum of $250,000, "secured by mortgage upon the whole or any portion of the property of the company." Acts of 1876, p. 258. Though the act of February 29th, 1876 (Acts of 1876, p. 118), which now forms sections 1689(v) to 1689(y) of the code, was in existence when the second mortgage was executed, it has no application to that mortgage, for the reason that this act relates only to railroad corporations formed by the purchasers of railroads in the mode pointed out by the provisions of the act.

The company made default as to the principal, as well as interest, on the second mortgage bonds in 1886, and as to the interest on the first mortgage bonds in March, 1890, and has continued thus in default ever since.

On the 30th of April, 1890, a train, when running upon the railway of the company by steam power, ran against or over the husband and also a son of Mrs. Green, killing them both; and on July 17th, 1890, she recovered against the company, in the city court of Savannah, $1,750, as her damages for this tort. The Messrs. Green, at the time of the homicide, were not employees of the company, or, so far as appears, under any contract relation to it or with it, but were simply members of the general public, passing on foot along a sidewalk adjacent to the railway track.

According to express provision of the mortgage deeds, the trustees could, when the default of the company in paying principal or interest due on any of the bonds had continued for sixty days, have entered into possession and operated the railway, or could have instituted legal or equitable proceedings to foreclose; but neither of these steps was taken until after judgment in favor of Mrs. Green was rendered, nor until October 25th, 1890, when a petition by the only trustee then in office and by one of the bondholders (the latter owning all the second mortgage bonds and most of the others) was filed in Chatham superior court to foreclose the mortgages and for the appointment of a receiver. This bondholder coplaintiff was president of the railroad.

company at the time of bringing this suit, and had been so continuously since the year 1883 or 1884. A receiver was appointed on November 7th thereafter, and the company turned over to him all of its property, including $225.04 in cash. Among the expenditures of the receiver, reported by him August 6th, 1892, was an item of $2,349.88 for steel rails, iron and cross-ties, which he had purchased and used in improving the property; and the net earnings for distribution reported by him amounted to $2,327.22. The *corpus* of the property when sold on July 5th, 1892, produced $75,000, none of which was expended by the receiver.

Pending the cause in Chatham superior court, Mrs. Green filed her intervention claiming payment out of the fund under the control of the court. There was a reference to a master in August, 1891, and the master reported in April, 1893, and again by supplemental report in March, 1894. The master disallowed Mrs. Green's claim as one having priority over the mortgages, ranking it as inferior to them, both as to *corpus* and income, and she filed exceptions to his reports, which exceptions the court overruled on July 9th, 1894, and approved both reports of the master. The verdict of a jury was rendered on August 3d, 1894, in conformity with the master's report, and on the next day exceptions *pendente lite* were filed by Mrs. Green complaining of error committed by the court in overruling her exceptions and in approving the reports. Afterwards on the same day, the court decreed finally in favor of the priority of the mortgages; and by bill of exceptions certified September 1st, 1894, Mrs. Green brought the case to this court, assigning error on the decree and on the matters embraced in her exceptions *pendente lite*.

Pending the case before the master, and on the same day of the receiver's last report, to wit August 6th, 1892, the court ordered the receiver's counsel to be paid $1,000 out

of income; and on December 17th, 1892, ordered the receiver himself to be paid a like sum out of the income.

Assuming both mortgages to be good and valid, and conceding their priority over Mrs. Green's judgment as to the *corpus* of the property mortgaged, two general questions arise for our determination, which are: first, had they a like priority in respect to the income; and secondly, if they had not, but the priority as to it was with the judgment, whether the application of a portion of the income to betterments, made by the receiver while he was in charge of the railroad and operating it, and of another portion, made by the court, to the payment of the receiver's counsel and to the receiver himself while the case was pending before the master in chancery, would defeat Mrs. Green's claim altogether, in so far as the fund derived from income has thus been exhausted, or whether that fund, so far as may be necessary to pay her judgment, should be reimbursed out of the fund produced by the sale of the *corpus*, and which was still under the control of the court at the time the final decree was rendered. Upon both principle and authority, the second question is, under the special facts of this case, so clear that it may be left to stand on the head-notes. The first question alone needs discussion in this opinion.

The first mortgage was fourteen and the second twelve years old when the corporation, while in possession and operating the railroad, committed the negligent tort for which Mrs. Green recovered her judgment. At that time some of the interest on the first mortgage bonds was overdue and unpaid, and all the principal and some of the interest of the second mortgage bonds had been due and unpaid upwards of three years. So far as appears, the corporation had no contract relation whatever with Mrs. Green or any of her family. Her judgment against the corporation for her damages was rendered two months and seventeen days after the cause of action arose. The petition in the foreclosure proceeding was filed five months and twenty-five days

after the double homicide was committed, and three months and eight days after judgment for the damages was rendered in the city court. Thirteen days later a receiver was appointed. It was not alleged that any demand upon the corporation had been made for possession of the mortgaged property, nor did the petitioners invoke the aid of the court to put them, or either of them, into possession so as to enable them to operate the railway and receive the income under the power contained in the mortgage deeds.

The fair presumption is, that the money turned over to the receiver by the corporation was a remnant of income earned and collected by the corporation, nothing to the contrary appearing. The receiver's operations resulted in a net income over operating expenses large enough (when swelled by what he expended for steel rails, iron and crossties used by him to improve the railway before it was sold out) to discharge the judgment and leave about fifty per cent. of the income fund to be applied to the expenses of the receivership other than current operating expenses. The *corpus* of the mortgaged property sold for $75,000, considerably more than the principal of the bonds, but not enough, even with the income fund added, to pay off the bonds, interest as well as principal. No doubt exists that the company is insolvent, and nothing in sight indicates that Mrs. Green will or ever can realize one cent for her damages unless she gets it by being allowed priority over the mortgages as to the income made by the receiver and the remnant of cash turned over to him with the railway, etc., when he entered into possession as receiver.

Each of these contestants had notice of how the corporation stood in relation to the other. The charter was the medium of notice to the mortgagee; the mortgages, together with the due recording of them, were notice to Mrs. Green. But of what avail was notice to her? The purpose of notice is to warn the notified not to deal or trust save in subordination to the right to which the notice relates.

Mortgagee, lender of money, or purchaser of bonds could profit by notice, but notice of a mortgage is wholly without efficacy in guarding one against suffering damage by a pure tort at the hands of the mortgagor. The observation of Mr. Justice Brewer in Kneeland *v.* American Loan Co., 136 U. S. 97, 98, repeated by Mr. Justice Shiras in Thomas *v.* Western Car Co., 149 U. S. 11, has no application to Mrs. Green; that observation being as follows: "No one is bound to sell to a railroad company or to work for it; and whoever has dealings with a company when property is mortgaged must be assumed to have dealt with it on the faith of its personal responsibility, and not in expectation of subsequently displacing the priority of mortgage liens."

Unless a mortgage upon property be also upon the income, a mortgagee out of possession has no claim or lien upon income. Teal *v.* Walker, 111 U. S. 242. This is true in Georgia, although the income accrue from the property while in the hands of a receiver. *Vason* v. *Ball*, 56 *Ga.* 268. Where income as well as *corpus* is embraced in the mortgage, the mortgagee excludes himself from all the income which accrues while he voluntarily remains out of possession. A right of possession which he declines to exercise is of no avail. Galveston Railroad *v.* Cowdrey, 11 Wall. 459; Gilman *v.* Ill. & Miss. Tel. Co., 91 U. S. 603; American Bridge Co. *v.* Heidelbach, 94 U. S. 798.

Where the mortgagee has by the terms of the mortgage a right to take possession after default of payment, make income and appropriate the same to his debt, and he elects not to do so but to apply for a receiver by an equitable petition to foreclose the mortgage and bring the property to sale, and pending the suit to make income through the receiver, he has not the same strict right to the income made by the receiver that he would have to income made by himself as mortgagee in possession. Custody by a receiver is possession by the court, and is exclusive alike of both parties to the suit. Undoubtedly a court of equity may treat income

made by itself through a receiver as legally its own, held in trust for the beneficiary best entitled to it. The mortgagee is still out of possession, and where he has neither demanded it nor applied to a court for aid in obtaining it, he is out by his own voluntary election. The court may, and where it finally decrees in his favor on the merits, generally will consider its own possession as substituted for the one to which he was entitled, and as attended with the same incidents touching net income; but the court is not absolutely bound to dispose of this income just as the mortgagee would have a right to apply it had it accrued from the mortgaged property while in his possession and under his own management. On the contrary, the court may consider and give effect to equities concerning it which the mortgagee might safely ignore or defy were he not a voluntary suitor for equitable relief. The *corpus* of the mortgaged property, whether realty or personalty, is no less the property of the mortgagor after it is put into the hands of a receiver than it was before, and in Georgia it remains his property until actually sold; not even foreclosure and decree of sale will terminate or divest his title. In practice we have nothing corresponding to a strict foreclosure in England. The net income made by the receiver, though embraced in the mortgage, is also the property of the mortgagor so long as it remains subject to control and application by the court, the mortgagee having absolute title to neither, but a lien upon both; but this income not having been in existence when the mortgage was executed, his lien, as to it, is not a legal lien, pure and simple, but one which gets its ultimate efficiency from equity through the doctrine either of equitable assignment or equitable estoppel. Jones, Chat. Mortg. §§170--175; 1 Jones, Mortg. (5 ed.) §149 *et seq.*; 1 Ping. Mortg. §453 *et seq.* Mortgage of income covers net income only. Jones, Corp. Bonds and Mortg. §§80--90; 1 Ping. Mortg. §461; 1 Jones, Mortg. §160; Fosdick *v.* Schall, 99 U. S. 252.

In equity, however it might be at law, it makes no sub-

stantial difference that these mortgages are trust deeds in form and convey absolutely; they ought, in this forum and on such a question of priority as that now before us, to be considered as mortgages pure and simple. So considered, they pass no title but are only securities for debts. Code, §1954.

With the trust deeds reduced in equity to the rank of mortgages, this is not a case in which one competing creditor has a legal lien and the other has none, for in Georgia a judgment lien attaches upon property previously mortgaged as well as upon any not so encumbered. "All judgments obtained in the superior, justices' or other courts of this State, shall be of equal dignity, and shall bind all the property of the defendant, both real and personal, from the date of such judgment, except as otherwise provided in this code." Code, §3580. "A future interest in personalty cannot be seized and sold, but the lien of judgments will attach thereto, so far as to prevent alienation before the right to present possession accrues." Code, §2625. A judgment against a railroad corporation binds all its property, including its franchises, except only its franchise to be a corporation. *City of Atlanta* v. *Grant*, 57 *Ga.* 340. The lien of Mrs. Green's judgment covers net income made by the receiver as fully as does that of the mortgages, and being statutory, it needs no aid from equity or equitable principles to render it a complete legal lien on income. Ought equity to afford aid to postpone or defeat it under the facts of the present case?

Without reducing the trust deeds to the rank of mortgages, how would the matter stand? In that case the mortgagee would take the legal title of the whole railroad property, the franchises included, and relatively to the public would stand as owner, for the time being; and since franchise and duty are inseparable, would be liable directly and primarily for the damages occasioned by the tort. To treat the deeds as mortgages is thus a favor rather than a dis-

advantage to the mortgagee and the bondholders he represents.

If it be said that as railroad property is peculiar, a mortgage upon it should, if the terms of the mortgage be sufficiently comprehensive, be construed to bind both future acquired *corpus* and future accrued income, *at law*, then we answer that because of this very peculiarity, the income so bound should, in a court of equity, be limited strictly to the surplus after satisfying all damages to the public occasioned by using the franchises, whether such use was by the mortgagor or the receiver. If it be said that by filing the petition to foreclose, or by actual seizure of the property through a receiver, a lien upon income arose, or the mortgage lien was aided, then the reply is, that this was after the judgment lien of Mrs. Green attached on *corpus* and was ready to attach on income as it accrued, and so the equity of the judgment is as much aided by its legal lien as the equity of the mortgage is aided by filing the petition or by actual seizure.

These joint plaintiffs, after describing Mrs. Green's judgment and other judgments, inserted an appeal to the heart of equity as follows: "And your petitioners show that as yet no active measures have been taken by the holders of said judgments to enforce the same, but that they have threatened and still threaten to levy the same upon the property of said defendant corporation and to sell out said railroad and its franchises; and petitioners show that any such levy and procedure must result in serious sacrifice, not only to said road, but to the holders of its lien securities, and that no proper adjustment and settlement of said various demands can be made except through the action of this court by the enforcement of remedies of an equitable nature. Your petitioners by this proceeding afford and offer to said judgment creditors, and to all other parties having legal demands against said defendant, full opportunity to intervene and to assert their claims; but

petitioners pray that in the event that either of said judgment creditors or any other creditor shall make any levy upon the property of said defendant, or otherwise proceed against the same, the court will at once, and from time to time as may be required, issue its writ of injunction against said party or parties, restraining all further proceedings by separate suits and compelling said parties to intervene and assert their rights in this suit.    Your petitioners show that they are remediless under the strict rules of the common law, and can obtain adequate and sufficient relief only through equitable principles and methods to be administered by this court."

Who are those who made this appeal to equity and invoked the remedy and rules of equitable relief?    The surviving mortgagee and one of his wards under the trust of the mortgages; this ward by virtue of owning all the bonds of the second issue and most of those of the first issue, joined in the petition as coplaintiff, being, moreover, president of the railroad corporation at the time of filing the petition, and having been so when Mrs. Green was made a widow-mother and when she obtained her judgment and for many years before, even when the first default of the corporation occurred.

As equity applies estoppel in aid of mortgages on future acquisitions, whether of *corpus* or income, it certainly might apply a like doctrine in aid of a judgment recovered by a wife and mother for homicidal negligence by a railway corporation which happened when one of the plaintiffs and the chief beneficiary of the suit was president of the derelict institution.    Would it be harsh to say to him in answer to his appeal: "Sir, if you had desired your bonds and coupons to have a sweeping and unlimited preference over a judgment for damages occasioned by negligent homicide, you ought to have seen to it that the injury causing the damages was not inflicted.    You were in control, whereas this wife and mother had no control, and nothing

to do with the management. It would be far better to impute the negligence of the corporation to you, its president, than it would be to turn her away empty that your coffers may be made a little more full." We do not propose, however, to rest the case on a ground so narrow, or on any which does not apply alike to all the bondholders.

It is of much importance to the wider and true ground that the income in question was made by exercising the franchises granted by the State to the railroad company, a corporation of a *quasi* public nature. Such corporations incur certain duties and obligations to the public which adhere firmly to the franchises granted, and cannot be separated from them without legislative consent. *Macon & Augusta R. Co. v. Mayes,* 49 *Ga.* 355, and cases cited; *Chattanooga, Rome & Columbus R. Co. v. Liddell,* 85 *Ga.* 482; *Central R. etc. Co. v. Phinazee,* 93 *Ga.* 488. These duties and obligations, equally with the franchises themselves, are matters of fundamental contract between the corporation and the sovereignty creating it, a contract which is paramount to all subsequent contracts which the corporation is capable of entering into with any person or for any purpose. By necessary implication these latter contracts are always qualified and held in check by the former, and in every conflict they must be subordinated to it. The corporation can grant to others no immunity as to its franchises which it could not claim for itself, nor can it in behalf of its creditors, or any of them, free the franchises from being answerable out of the revenue produced by their exercise, for torts committed in the use of them, whether such torts be committed by the corporation itself or by others using the franchises with its consent or by its permission. It is by reason of this firm adhesion of duty imposed to franchise granted that an incorporated railroad company cannot lease its line of railway and permit it to be operated by the lessee without being liable for negligent torts committed by the lessee, to the same extent as if they

were committed by itself. See authorities cited in 2 Cook on Stock and Stockholders (3 ed.) §906; 3 Wood on Railways (Minor's ed. 1893), §§489, 490. And this rigid rule of liability, which is directly the opposite of that which prevails touching leases where no charter franchises of a *quasi* public nature are involved, is not relaxed in favor of a company having express permission from the legislature to make the lease, unless there be also an express exemption or grant of absolution from liability. *Singleton* v. *Southwestern Railroad,* 70 *Ga.* 464.

Thus, in the case of a mere permissive lease of a railroad, there is cumulative rather than diminished security to the injured citizen, who, for a tort committed upon or against him by the lessee, in the exercise of franchises derived from the lessor, can hold either or both answerable for the damages. The essential reason on which the adjudged cases respecting the lease of railroads is founded is broad enough to extend and apply to mortgages, at least in so far as mortgages are designed to encumber future income. After a railroad company has mortgaged all its line, constructed and to be constructed, all its motive power and rolling-stock, all its stations and depots, all its franchises acquired and to be acquired, and all its future income save that which may accrue before it defaults on any of the mortgage debt, what besides this excepted income, supposing the mortgage to be valid and enforced as written, is left from which to make satisfaction for torts committed by the company during the indefinite time which it may be the interest or the pleasure of the mortgagee to stay out of possession and leave the company in? By chance there may be a surplus left from the proceeds of the *corpus* or from income, or from both, after the discharge of the mortgage, but by an equal chance there may be none, and by still another chance a large deficiency may be the outcome. It is and has long been matter of common knowledge and general information which of these chances is most likely in any given instance

to be converted into certainty, become realized as a fact of experience, and take its place in history. It would seem reasonable that, relatively to negligent torts by whomsoever committed in the use of the charter franchises, the mortgagee of a railroad should, under the rule of public policy applicable to this kind of property and constantly applied to it in respect to leases, be regarded either as owner or as holding his incumbrance in subjection to the duties and obligations resting upon the owner and so interwoven with the franchises as to be inseparable from them otherwise than by express statute. Regarding him in either light he could not equitably appropriate to his mortgage debt income earned by the mortgagor or by a receiver, and leave a sufferer from such a tort uncompensated and without redress. If treated as owner he would himself be liable, in the first instance, for the damages occasioned by the tort; and if treated as holding his mortgage lien in subjection to the charter burdens imposed on the mortgagor, the least that he could justly do would be to stand aside as to so much of the income as might be necessary to right the wrong done by the tort. Can these charter burdens or any of them be evaded by creating the relation of debtor and creditor with or without the relation of mortgagor or mortgagee superadded, any more than by creating the relation of lessor and lessee? Of what avail to the public would be the mere personal liability of a corporation with all its substantial assets bound hard and fast by mortgage, the mortgagor remaining in possession and continuing to exercise all the corporate franchises? Can the whole of the corporate assets, including these franchises and the fruits of their exercise, be impounded by a mortgage contract or any other, and put in a bomb-proof for ten, twenty, fifty or a hundred years, the term of credit, and for any period of indulgence or forbearance thereafter which the mortgagee may choose to grant?

It is manifest that the distinction between general and special creditors, or between general liens and specific liens,

is only nominally involved; or, if really involved, is favorable to the involuntary creditor, made so by tort, rather than to the voluntary creditor by mortgage, where these two creditors are the contestants over income and where the mortgagor is a railroad corporation and the mortgage covers all its effects, real and personal, present and future. The lien of such a mortgage, when aided by the doctrine of equitable assignment and estoppel as to *corpus* acquired and income produced after its execution, is as comprehensive, and therefore as general, as the lien of a judgment based on the tort is or could be. In such a case, the liens are equally general, for the voluntary creditor did not extend credit or take security merely upon some particular property of his debtor, but upon all he had or might ever get. And what specializes the involuntary creditor, or tends to specialize him with pathetic emphasis, is that he did not extend credit at all, but was forced to become a creditor against his will and without any security whatever, save that afforded him as one of the general public by the charter of the wrongdoer. One creditor who, by any contract whatever, secures himself on all his debtor's effects, all the present and all the future, without limit of time, has no claim to be considered as a special creditor, and is not entitled to any favor whatever in a court of equity beyond what the rules of inexorable law entitle him to demand, as against damages for a tort committed by the debtor to a stranger, whether pending the term of credit or after it expired. The reason why specific liens prevail over general legal liens is, that there is something left, or possible to be left, for the latter after the property covered by the former is all absorbed. A special lien is a lien upon particular property. If a lien extends to everything, acquired and to be acquired, it is not special merely because it was created by mortgage or other express contract. Relatively to income, the judgment of Mrs. Green is far better entitled in equity to the status of a special lien or charge than are these mortgages. The

plaintiff in that judgment is a creditor by compulsion, as was the damaged creditor in *Central Trust Co.* v. *Thurman,* 94 *Ga.* 735, where the damage resulted to a tract of land by reason of taking part of the tract for right of way. The strong equity on the side of the involuntary creditor is too obvious to escape the discernment of a child, and the question comes down to this: whether the law as administered by courts of equity will, on the ground of public policy, in view of the paramount rank of charter duties involving public safety, give effect to this equity on income made by a receiver, when it is supported by a junior legal lien—the lien of a general judgment for the assessed damages?

Duty is inherent in franchise, adheres to it, and, as we have seen, cannot be separated from it without express enactment. It would be far more rational to subject the *corpus,* especially the *corpus* of the franchises, than to exempt income. The present case, however, calls for nothing beyond subjection of the latter. It is like stopping on the freight earned by the voyage and sparing the ship. Benefit and burden are correlatives, and he who would appropriate all a debtor has, must adopt such of his burdens as are fundamental to his debtor's right to have existence and create any debt or incur any obligation whatsoever. Burden equals benefit as a ground of equitable preference; and the loss by reason of the debtor's insolvency is to be borne by the creditor who would have been ultimately benefited if no loss had occurred, or if the loss occasioned by failure of the debtor in his duty had been a gain instead of a loss.

Like the electric current, preference or special priority of payment has, in reference to a "going concern" of a *quasi* public nature, two opposite poles. Any adjudication. must be wrong which, overlooking this, treats it as having but one. The positive pole is benefit, public and private— benefit to all and benefit to the individual, one of the necessary individuals to be benefited being the holder of the

incumbrance which would rank first were there no special priority to be considered. The negative pole is burden, burden like that of diligence imposed by public policy for public benefit, for the interest of all; but in the nature of things any disregard of it not benefiting but tending to injure the individual who would otherwise be and remain the favorite. Upon him it falls incidentally as a loss by misfortune, just as a failure in duty by others often affects us, and our failure in a like duty as often affects them. A doctrine of preference based exclusively on benefit would pay preferentially for feeding the winning horse, for riding him and even for whipping and urging him on to the goal, for making him go and keeping him a "going concern," but not for damage done to a person run over in the race in consequence of negligence by or attributable to the owner. Maritime law, which is more conversant with "going concerns" on a large scale than any other branch of law, because it has dealt with them longest, would discriminate, not against the claimant for damages, but in his favor. 14 Am. & Eng. Enc. of Law, 443; 16 *Ib.* 358; Force *v.* Pride of the Ocean, 3 Fed. Rep. 162; The John G. Stevens, 40 Fed. Rep. 331. In building up and developing a system of liens applicable to supplies, repairs, advances, wages, pilotage, towage, wharfage, salvage, damages by tort, etc., etc., it has put damages by tort at or near the head of the list, and the reason for doing so is one of public policy, the encouragement of safe navigation; a reason no less applicable to railways extending along or across public thoroughfares than to ships or steamers on the ocean, seas or rivers; collision by cars or trains of cars with persons or property on land being as probable and frequently as hurtful as like collisions by vessels on water. Peril to person and property has shaped public policy with reference to marine torts, and that element exerts, and ought to exert, a chief influence in shaping it with reference to torts by railroads. Equity, like other divisions of jurisprudence, takes notice

of public policy, promotes it and conforms to it. 1 Spence, Eq. Juris. 427, and note. Indeed, the great equity maxim, "Once a mortgage always a mortgage," is based upon it. *Ib.* 599–603.

If it be said that in maritime law torts by a ship are attended with a lien on the ship for the damages, and that in equity no lien arises out of torts by a railroad company, the answer is, that though this is true, torts by the latter, as against a mortgagee of the franchises, are attended by an equity in behalf of the injured party as strong as that on which the ranking of the maritime lien for damages is founded. No one can doubt that relative strength of equities has been a ruling consideration in fixing the priority of the various maritime liens as compared one with another. In so far as limiting the recovery for maritime torts to the value of the ship has influenced that priority, a like limitation arising out of the actual facts of the situation exists as to the assets of a railroad corporation; not, indeed, a limitation upon the right of recovery for torts committed by such a corporation, but upon the possibility of realizing the recovery, where not only the franchises and income of the railroad are mortgaged, but all other effects of the corporation, and where the corporation after making the mortgage and committing the tort proves insolvent. Whenever an equity is treated as a lien, it is so treated for the purpose of rendering it effectual to take and hold money, not merely to base an action upon; and any equitable right of payment which courts of equity will enforce as against some previous incumbrance competing with it for payment out of the given fund is virtually an equitable lien, whether called a lien or a "preferential claim." A maritime lien for damages is a legal, not an equitable, lien, though doubtless it got its rank, if not its existence, from the strong inherent equity of holding a ship answerable for injuries done by its instrumentality, no matter who was on board, or to whom it belonged, or who had mortgages or

v 97-3

other liens, maritime or non-maritime, upon it, and no matter whether the wrong was done or the seizure for it was made on the high seas or in a home port or a foreign port. Indeed, though the lien owed its origin to public policy, this very equity underlay that policy, and thus was the ultimate ground of the lien, both with reference to its existence and its rank.

"The feather that adorns the royal bird supports him in his flight; strip him of his plumes, and you fix him to the earth." This language was applied to the highest corporate being in a monarchy—the King. But the bird may well stand for a subordinate corporation, especially when it exists only to move persons and property from place to place, as does a railroad corporation, and whose wings consist of chartered franchises, as real instruments of locomotion (though immaterial) as the pinions of a bird or the sails of a ship. No chartered railroad could be "a going concern" save for its franchises; and by the use of these, to hurl locomotives, cars or trains against persons or property to their injury or destruction, is no less violative of public security and public policy than, by the use of sails or steam, to run one vessel against another on the high seas. The same policy which, irrespective of mortgages and other prior liens, holds the vessel to answer for the damages in the latter case, might well hold the railroad, more especially the franchises and their produce, to answer for the damages in the former case.

*Salus populi suprema lex* is a cardinal maxim. It is the whole gospel of public policy condensed in a single text. The safety of the people is the supreme law; the good of the public first and before everything else. On the benefit side, the good of the public and the good of the mortgagee of a railroad coincide. Because of this, courts of high authority hold that supplies or services essential to keep a railroad in operation and enable it to answer the ends of its creation may become a charge upon income made by a re-

ceiver subsequently appointed. The consequence of so charging income may be made to affect the mortgagee irrespective of his consent. People may, by procurement of the mortgagor in possession, volunteer to benefit the mortgagee; and if they succeed, may claim reimbursement or just compensation out of income. In the civil law, there was something slightly analogous. A person who volunteered to act, and did act, without authority, in the affairs of another, during his absence, was called by that law *negotiorum gestor*, meaning a manager of business. The duty of reimbursing, but not of rewarding him, was enforced if his action proved beneficial to the absentee. Though an intermeddler, he was not forced to suffer in consequence of his useful officiousness, but was not allowed to profit by it. The principle is, at bottom, the principle of salvage. In maritime law, it has its literal and most striking application to services rendered in saving ships from threatened destruction. The right to volunteer assistance without being called on or employed to render it, springs up out of urgency—the urgency of the occasion. Peril and emergency serve as a letter of credit, and as a pledge of the endangered property as security for payment. Whoever is present at the scene of the threatened disaster may interfere, avert calamity and save the ship. Toned down and shaded off for business attended with less hazard, this principle of salvage is also applicable when only moderate perils are involved—perils which in no way threaten destruction, and some of them not to the ship itself at all, but only to the voyage or its speedy and successful accomplishment. Thus, for needful supplies furnished, or repairs made, etc., maritime law renders the ship liable and raises a lien upon it to secure the debt. So rational and comprehensive is the principle, that we find it, in a modified form, prevailing to some extent in the common law, as is shown, for instance, in the frequent and familiar example of necessaries furnished to a wife or child under certain conditions, without the con-

sent, or even against the declared wish, of the husband or father.    The law holds him liable to pay for them, provided they were proper in kind, quality and quantity, and necessary to keep the woman or the infant "a going concern." We have a case in which the principle was applied in equity to a policy of insurance, where a stranger furnished money to pay installments of premium when, if not paid, the policy would have lapsed and become lost to the beneficiary. *Hodge* v. *Ellis*, 76 *Ga.* 272.    The stranger was allowed not only to be reimbursed his advances, but to share in the fruits of the salvage.    In the case of *Raoul* v. *Newman*, 59 *Ga.* 410, Raoul was the station agent, at Macon, of the Central Railroad, and Newman was a physician.    A negro boy, 13 or 14 years of age, was severely injured on the track in the yard of the company's warehouse.    The father of the child was absent, and Raoul called in Newman as a physician.    Services were rendered and charged to Raoul.    This court held that if there was a great and overwhelming calamity to the child, rendering medical aid instantly necessary, the parent would be responsible as for necessaries, and Raoul would be treated as his agent to call the physician.

The principle of benefit is salvage, in a wide and comprehensive sense, and the principle of burden, on the other hand, is the inseparability of fundamental charter duties from charter franchises.    The discharge of these duties is a burden laid upon railroad corporations by the law of their existence.    Performance of them is attended with benefit both to the public and to mortgagees, and their violation tends to the injury of both.    In so far as redress for violation can be made from the fruits of the franchises, the produce or income of their exercise, it is manifestly more just that this redress should go to a wrong and maltreated stranger than to a mortgagee, even though they be alike blameless.    The mortgagee is in privity, a voluntary privity, with the corporation; the stranger is not.

Every direct authority known to us is against us; never-

theless, we are right and these authorities are all wrong, as time and further judicial study of the subject will manifest. The mistake made by courts and judges has been that they treat the problem of preferential debts as having but one pole, the affirmative pole of benefit, ignoring the negative pole of burden altogether. It may be that several of the cases seemingly adverse to us were decided correctly on the facts involved in them, but the spirit and reasoning of all the cases are viciously narrow and unsound. There seems to be a theory that if mortgaged railroads can be kept "going concerns," it matters not what else may stop. That the public is decidedly the most important "going concern" in existence appears to be overlooked. As a part of the public, the husband and the son of Mrs. Green were "going concerns," and the going of this railroad was the cause of their ceasing to be such. The cases on which we are animadverting would treat as a preferential debt a claim for the coal or wood consumed in generating the steam which killed them, but would deny any preference whatever to a judgment for damages resulting from the homicide. Public policy certainly favors keeping the franchises active, but it favors more the security of all who as a part of the public are liable to suffer by their activity. No policy is subserved by going wrong. Non-feasance is better than misfeasance; idleness is better than homicidal mischief resulting from a vicious or negligent activity.

Two of the most important and best considered cases which lie in our path are Hiles v. Case, 14 Fed. Rep. 141, and St. Louis Trust Co. v. Riley, 70 Ib. 32. In the first there were several interveners who wanted damages for burning their timber and cranberry marsh. The fire resulted from sparks escaping from locomotives, upwards of four months before the receiver was appointed. In a brief, clear and admirable opinion, except that it fights on the wrong side, if not of the case, certainly of the question discussed, Judge Dyer, of the Eastern District of Wisconsin,

proceeds to fire the interveners from his court by a volley of judicial sparks, thus:

"To sustain the claims in question, it is therefore necessary that some equity be found in favor of the petitioners, and superior to that of the bondholders, upon which to base their allowance; and the supposed equity is that the fire in question occurred after default on the part of the railroad company in payment of the mortgage debt or interest; that thereafter the company operated the road as the agent or trustee in equity of the bondholders, and that the alleged liability sought to be enforced in the present proceeding arose from such operation of the road, and as an incident thereto; that therefore it may be put under the head of operating expenses, and so acquire rank as a claim enforceable against the earnings of the road in the hands of the receiver.    There is some plausibility in the argument, but it is unsound.    No relation of principal or agent, either in law or equity, can be implied from the mere fact that the railroad company continued to operate the road after it was in default in payment of the mortgage debt, nor from the further fact that the bondholders did not take possession of the property after such default, nor from both facts combined.    The mortgages gave to the mortgagees the right to take possession after default, but they were not obliged to do so, nor was it necessary that they should take possession in order to avoid such a liability as is here claimed.    The railroad company was operating the road when the alleged loss and damage occurred.    The negligence of the company, if there was negligence at all, occasioned the loss. For that negligence it alone was responsible.    To sustain the position taken by the petitioners it must be held that the bondholders at least impliedly assumed liability for the negligence of the railroad company, and that by operation of law this mortgage security was subordinated to claims of the character of these.    I cannot so hold.    The alleged cause of action accrued after the company had given mort-

gages upon all its property, which were then subsisting liens, and before the receiver was appointed. It can make no difference that they accrued after the company was in default of payment of interest on its bonds. The road was still being operated by the company, and whatever liability existed must have been one against the company alone. In no just or proper sense could such claims as these be considered as part of the operating expenses upon which the petitioners could assert a right prior to that of the mortgagees. They are wholly unlike claims for supplies, new equipment, right of way and new construction, or any claim falling legitimately under the head of operating expenses, which the court sometimes orders paid from net earnings in the hands of a receiver, as presenting equities superior to those of bondholders.

"If such claims as are here in question could be allowed, there would seem hardly to be a limit to the allowance of demands which it might be as forcibly argued were superior in their equities to those of the secured creditors, but which could not be allowed upon any sound principle of equity, nor without substantially impairing, and perhaps destroying, an otherwise valuable security."

The other case, St. Louis Trust Co. v. Riley, was decided as late as September 30th, 1895, only a few days before our judgment in the present case was announced. Its existence was unknown to us until after that time. A very able court decided it, the Circuit Court of Appeals for the Eighth Circuit, the members of the court presiding being Circuit Judges Caldwell, Sanborn and Thayer. The opinion was written by Judge Sanborn. The intervener rested his case on a judgment recovered for a personal injury, and the question considered was, "Is a claim for damages caused by the negligence of a street railway company, a mortgagor, five months before a receiver was appointed in a suit to foreclose a mortgage upon its property and income, entitled to be preferred to the mortgage debt in payment

out of the earnings of the railroad during the receivership?"
The decision was in the negative, for the usual reason,
namely, that the claimant had not benefited the mortgagee
or the bondholders by suffering wrongful hurt to himself at
the hands of the railway company.    Seventeen cases de-
cided by the Supreme Court of the United States, not one
of them involving tort prior to the appointment of a re-
ceiver, are cited and reviewed in the opinion, after which it
proceeds thus:

"From this brief review of the decisions of the Supreme
Court bearing upon this question, we think these proposi-
tions may be deduced:

"First. There are certain claims against a mortgaged rail-
road company, accruing before the appointment of a re-
ceiver, which are entitled to a preference over a prior mort-
gage debt in payment out of the earnings of the railroad
during the receivership and out of the proceeds of the sale
of its property.

"Second. It is an indispensable element of every such
claim that it is founded upon property furnished or services
rendered to the mortgagor, which either preserved or en-
hanced the value of the security of the mortgage debt, and
thereby inured to the benefit of the mortgagee.

"Third. Claims of this character have been given a pref-
erence over the mortgage debt by these decisions on one of
two grounds,—either on the ground that the mortgage is a
lien on the net, and not on the gross, income of the railway
company, and where that part of the income that is applica-
ble to the payment of current expenses of operation, proper
equipment, and necessary improvements has been diverted
to pay interest on the mortgage debt or to otherwise benefit
the security, and this diversion has left claims for these ex-
penses unpaid, it is the province and duty of the chancellor
to restore the diverted fund by taking an equal amount
from the earnings of the railway company during the re-
ceivership, and applying it to the payment of these claims

in preference to the mortgage debt;  .  .  .  or on the ground that the payment of the claims is necessary to preserve the mortgaged railroad and keep it a going concern. It is indispensable that the operation of a railroad be uninterrupted in order that the travel and traffic of the public may be acommodated, and in order that the franchises of the railroad company may be preserved from forfeiture. Hence the wages of employees, who might otherwise cease from their work, the amounts due to connecting lines of railroad that might otherwise cease their business relations with the managers of the mortgaged property, and the claims for supplies and materials necessary to keep the mortgaged railroad a going concern, may, in proper cases, be paid. out of the earnings during the receivership, or out of the proceeds of the sale of the mortgaged property, in preference to the mortgage debt. . . But a claim for damages for the negligence of the mortgagor lacks the indispensable element of a preferential claim. It is not based upon any consideration that inures to the benefit of the mortgage security. Wages, traffic balances, and supplies produce or increase income, and preserve the mortgaged property. Repairs and improvements increase the value of the security of the bondholders. But the negligence of the mortgagor neither produces an income nor enhances the value of the property. The wages, traffic balances, and claims for material and supplies accrue under and pursuant to the contract between the mortgagor and mortgagee that the former will properly operate the railroad. The damages for negligence accrue in violation of that contract, and for a breach of the duty of the mortgagor to operate the railroad carefully. Many preferential claims are for property or services that were necessary to make or keep the railroad a going concern, necessary to its operation. The negligence that is the foundation of this claim did not tend to keep the railroad in operation, but, if repeated and continued, would inevitably stop it. It was not necessary, but was deleterious to its operation. For

these reasons this claim for damages cannot, in our opinion, be allowed a preference over the mortgage debt in payment out of the income earned by the receivers."

Courts which thus reason and decide may possibly be reached by the late discovery of Professor Röentgen, and for their benefit and the benefit of the profession generally, we shall close this opinion with appropriate illustrations, based on the new process.

Judge Seymour D. Thompson has produced a comprehensive, thorough, and truly great work on the law of Private Corporations, one that no court or lawyer can afford to overlook or neglect, for it evinces a study of the subject in its breadth and in its details which is marvelous, and the results of which cannot fail to be highly useful, not only to us of to-day, but to coming generations. Perhaps such a vast body of law on any one subject has never before been collected together and reduced to orderly arrangement and concise statement. The work is an immense magazine of learning, and yet of such practical bearing as to have no obtrusive air of erudition. Its only aim is to inform and aid the reader. This work (Commentaries on the Law of Corporations, vol. 5, §7050) states the law of our question thus:

"Claims for damages for torts committed by the corporation prior to the appointment of the receiver, whether reduced to judgment or not, are not to be preferred before existing liens in the distribution of the funds in the hands of the receiver, but such claimants stand on the footing of general creditors. An exception to this rule is, that it is within the discretion of the court applied to for the appointment of a receiver, to refuse the appointment, unless the petitioning bondholders will consent to an order that claims of this nature shall be preferred."

In holding the true law of the question to be otherwise, no necessary conflict with any personal or independent opinion of Judge Thompson is involved; for it does not

appear that he has formed any deliberate opinion of his own touching this special question, or attempted more with his own mind than to follow on the line of the precedents which a few courts have furnished, state the supposed law as they lay it down, and cite, if not all, some of the cases relied on. If, on reading this present opinion even casually, he should differ with its conclusion, and this should become known to the writer, his own confidence in that conclusion would be startled, if not somewhat shaken, for on several branches of law, Judge Thompson is authority; on corporation law he is very high authority.

ILLUSTRATIONS.

Before exposure to the Cathodic Ray.

Hand of mortgagee extended for *all*.

Hand of widow and ex-mother extended for *some*.

After exposure.

NOTE.—Color or shading indicates merit and the degree of it.

*Judgment reversed, with direction.*