McCULLOUGH ET AL. *v.* UNION TRACTION COMPANY OF INDIANA ET AL.

[No. 25,974. Filed June 27, 1933. Rehearing denied February 14, 1934. Petition to modify denied June 15, 1934.]

*Gentry, Cloe & Campbell, Gavin & Gavin, N. E. Elliott, Wymond J. Beckett,* and *Bagot, Free & Bagot,* for appellants.

*Smith, Remster, Hornbrook & Smith* and *Thompson, Rabb & Stevenson,* for appellees.

HUGHES, J.—The appellee, Union Traction Company, is a public utility corporation, and operates various lines of street and interurban railways in the State of Indiana. On December 31, 1924, a receiver was appointed for said corporation. After the appointment of a receiver, the appellants filed claims based on injuries to

persons, and damages to property, arising out of the operation of the business of said Union Traction Company prior to the appointment of the receiver. The appellants claim a right to preference and priority of payment as a part of the operating expenses of said railroad. The receiver reported to the court on May 24, 1927, the fact that said claims were filed, and that the claimants were contending preference and priority in payment to the mortgages. The claims were consolidated for the purposes of the trial on the question of the right to priority of payment.

The claims of the appellants are based on the theory that they are part of the natural, usual, and ordinary operating expense of said railroad, and that the mortgagees took their mortgages with the understanding. that all railroad operating expenses were to be paid out of current revenues before such mortgagees had any claim upon such revenues.

Some of the claims were for damages to property, and some for personal injuries. Some of them were reduced to judgments, while others were unliquidated at the time of trial. The existence of the claims was not disputed, and the validity of the appellee's mortgages was not attacked. The sole question presented at the trial was whether or not these tort claims had a preference and priority over the mortgage creditors. The lower court held that the claims of the appellants were general claims, and were not entitled to any preference or priority of payment over the mortgage creditors out of the assets of the Union Traction Company.

There were eight trust companies that were mortgagees and. trustees for holders of bonds issued under, and pursuant to the mortgage of the Union Traction Company and other companies that had from time to time. been consolidated with the Union Traction Company of Indiana.

Special finding of facts and conclusions of law were requested, and the court made fifty-nine special finding of facts, and stated three conclusions of law thereon.

The errors relied upon for reversal, consists of exceptions to the court's conclusions of law based upon the special finding of facts.

The finding of facts numbered (1) to (18) inclusive has to do with the organization and consolidation of street and interurban railroads with the Union Traction Company of Indiana; finding number (20), found that on December 31, 1924, on the application of Westinghouse Electric & Manufacturing Company, Arthur W. Brady was appointed receiver for the Union Traction Company of Indiana; that he qualified and took possession of the property of said Company on said day; finding number (21), found that prior to June 19, 1925, no suit was filed, and no action taken by any trustee under any of the mortgagees to foreclose the lien of any of said mortgages, or to sequestor, or to take possession of any of the mortgaged property. That on June 19, 1925, the Equitable Trust Company of New York, Trustee, commenced two suits in this Court (Madison Circuit Court) to foreclose the mortgage dated July 1, 1899, and July 1, 1902. No demand for possession of the property, and assets of said Traction Company was ever made by any of the bondholders or trustees under any of said mortgages. Finding number (22), among other things found that one of the provisions of the mortgage of July 1, 1899, was as follows: "Now, therefore this indenture witnesseth, That the Traction Company, the part of the first part, in consideration of the premises, and of one dollar to it in hand paid by the Trustee . . . and in order to secure the payment of the principal and interest of the bonds aforesaid to be issued . . . has granted, bargained, sold, conveyed, released, confirmed, warranted, assigned, transferred

and set over and by these presents does grant, bargain, sell, convey, release, confirm, warrant, assign and set over unto said party of the second part as trustee, and to its successors in the trust hereby created, and to its assigns all lines of street railroad constructed or to be constructed and all rights of way acquired, and to be acquired by said Traction Company in and through the cities of . . . and the territory adjacent thereto . . . also all real estate now owned or which may hereafter be acquired by said Traction Company and all other property . . . now owned or may be hereafter acquired by said Traction Company together with all rents, tolls, earnings, profits, revenues, or income arising or to arise therefrom." Article No. 2 of said mortgage contains the following provision: "So long as no default shall be made in the payment of the principal or interest, or any part thereof; payable upon the bonds hereby secured as the same shall respectively become due and payable, or in the performance of the covenants herein contained to be performed by said Traction Company, the Traction Company shall be suffered and permitted by the Trustee to remain in full possession, enjoyment, and control of all the franchises . . . and shall be permitted to manage the same, and to receive, receipt for, take, use, enjoy, and dispose of the rents, tolls, earnings, profits, revenues, and income thereof in the same manner, and with the same effect as if this indenture had not been made with the right at all times, as the proper management of the business of the said Traction Company may require, to alter, change, add to, repair, and remove the buildings, works, machinery . . . and other appurtenances to the property constructed or owned by the Traction Company, and conveyed or intended to be conveyed hereby to the trustee, provided that the security of said bonds shall not thereby be in anywise reduced, or impaired.

The special finding of facts show that all the mortgages were in the usual form of railroad mortgages, and contained similar provisions.

Finding number (30) found that prior to December 31, 1924, said Union Traction Company of Indiana negligently injured certain persons and damaged certain property. Finding number (31), found that continuously from the effective date of the Workmen's Compensation Act of Indiana, down to December 31, 1924, when the receiver was appointed said Union Traction Company was an employer of labor within the meaning of said Act. That on August 18, 1915, said Union Traction Company duly elected not to operate under said Indiana Workmen's Compensation Act, and gave notice to except and to exempt itself from and did reject the provisions of said Act. No certificate was obtained from the Industrial Board of Indiana permitting the Company to carry its own liabilities to employees, or to the public. Finding number (32), found that on August 26, 1913, the Public Service Commission of Indiana entered an order permitting said Union Traction Company of Indiana to follow the system and classification of accounts prescribed for interurban and electric railroads by the Interstate Commerce Commission, and relieved said Union Traction Company of Indiana from following the classification prescribed for interurban, and electric street railroads by the Public Service Commission of Indiana, "wherever there should be a variance in the two systems or classification." Said order has been in full force and effect ever since August 27, 1913.

Finding number (33), found that on May 28, 1914, the Interstate Commerce Commission prescribed a uniform system of accounts for electric railroads effective July 1, 1914, which system has been in force and effect continuously since said date. That so much of said uniform system of accounts prescribed by the Inter-

state Commerce Commission as relates to a reserve for injuries, and damages among other things provides:

"92.  Injuries and Damages.

"This account shall include expenditures on account of persons killed or injured, and property damaged. . . .

"442.  Operating Reserves.

"This account shall include the balances representing reserves created by charges to Operating Revenues or to Operating Expense to provide for over charge personal injury, loss and damage, and other claims, for equalization and for similar purposes, such charges being made currently for the purpose equalizing charges to operating accounts for the current accounting year."

Finding number (33), among other things, found that said Uniform System of Accounts does not prescribe, or require that any assets, funds, or property be set aside, appropriated or segregated for the purpose of defraying the liability represented by account number 442. Said Uniform System of Accounts does not prescribe an account, to be kept on the credit side of the General Balance Sheet, in which any cash, securities or other assets which the carrier may elect to set aside for the discharge of the liabilities represented in said account, number 442, shall be listed and accounted for, which account is numbered 414, entitled "Insurance and other funds."

Finding number (34), among other things, found that the said Union Traction Company of Indiana, and its receiver pursuant to said orders of the Interstate Commerce Commission have continuously kept their accounts in the manner and form required by said Interstate Commerce Commission, and particularly they have maintained on their books, accounts entitled "92, Injuries and Damages," and "442, Operating Reserves, Injuries, and Damages." That each year beginning with the year 1913, continuously until the appointment of the receiver, the Traction Company caused said Injuries

and Damages Reserve Account to be from time to time credited with such amounts as in the judgment of its officials would be at least equal to the expenses on account of injuries and damages to persons and property occasioned in the operation of said interurban railway and also charged to said Injuries and Damages Reserve Account, all disbursements made on account of such expenditures from time to time. . . . That said Injuries and Damages Reserve Account, at all times showed a credit balance, and on December 31, 1924, at the time of the appointment of the receiver herein there remained a credit balance to said account in the sum of $185,100.08. That the receiver since his appointment has continued to handle said account, and the credits and debits thereto, in the same method and manner hereinbefore in this finding set forth; that neither said Union Traction Company of Indiana, nor its receiver has at any time had any fund, money, property or assets of any kind or character representing said Injuries and Damages Reserve Account, or segregated or set apart for such purpose, but that said account as hereinbefore found, is purely a bookkeeping account, and is required to be kept for the purpose of estimating the liabilities which will be incurred by the Union Traction Company of Indiana and its receiver, on account of damages to persons and property, and for the further purpose of handling such liabilities on an estimated rather than an accrual basis from a bookkeeping standpoint, to the end that the expense thereof shall be spread evenly on a monthly basis; that neither said Union Traction Company, nor its receiver has at any time segregated, designated, or set apart upon its books of account or otherwise any specific funds, money, property or assets of any kind or character for the purpose of paying or discharging any liability of said Traction Company or its receiver on account of damages to per-

son or property, but on the contrary the payments made by said Union Traction Company, and its receiver in discharge of such liabilities have always been made out of the current general assets and funds of said receivership, and thereafter charged as a matter of bookkeeping to said account, that in this respect the payment of such liabilities has been on the same basis as that of other general indebtedness and expenditures of said Traction Company, and its receiver. The court further found as a fact that the method of bookkeeping prescribed by the Interstate Commerce Commission as hereinbefore set out for said Injuries and Damages Reserve Account is merely a bookkeeping method for the purposes hereinbefore found, and that the adoption of the same by the Traction Company and its receiver did not result in the creation of any fund to which persons claiming damages on account of injuries to their persons or property have any right to resort or to which they have any claim of any kind or character.

Finding number (37) found that the payment of the claims of claimants was in no sense necessary to the continued operation of the interurban railway system owned by said Union Traction Company, either by said Company or its receiver; that said claimants have not enhanced the value of the mortgage security covered by the mortgage hereinbefore on these findings specifically set out, nor have said claimants in any way benefited the mortgagees or trustees under said mortgages and deeds of trust.

Finding number (39) found that each and all of the claimants named in finding (30) are based upon alleged acts of negligence arising prior to the appointment of the receiver out of the operation of the business of the Traction Company by its officers and agents and those claimants who are therein designated as employees, received injuries arising out of and in the

course of their employment which formed the basis of their respective claims herein. Finding number (40), found that the claimants listed in finding (30), as having judgments, have reduced their respective claims to judgments, which judgments have remained unpaid from the date thereof as shown in finding (30) ; and the defendant Arthur W. Brady, as receiver of the Traction Company has been, since the date of his appointment, and is now, constantly receiving money from the agents, conductors, and employees of said Traction Company in the operation of the business of said Company.

Finding number (42) found that a schedule of rates and fares was fixed and established by the Public Service Commission of Indiana, pursuant to law, to be charged by the Traction Company in the operation of its business as a public utility, and such schedule of rates and fares has been adhered to by said defendant company in order to produce revenue, and funds with which to meet and defray the costs and expenses of operation; and during the years 1922, 1923, 1924, 1925, and 1926, the defendant company, by its officers, and by the receiver has promulgated a system of bookkeeping in accordance which the rules and regulations of the Interstate Commerce Commission, and has therein provided for an account to be known as the "Injuries and Damages Reserve Account," and from year to year it has estimated the probable amount of liability that would be incurred, and classified as injuries to persons, and damages to property, and it has credited to such account, such estimated amounts of liability from month to month. That during the years above mentioned from 1922 to 1926, inclusive, said defendant company, by its officers and its receiver, has credited a sum equal to two and three-fourths per cent of its gross earnings to said account; that during the year 1927, the re-

ceiver of this court credited to said account a sum equal to two per cent of such gross earnings.

Finding number (43), found that said Traction Company by its officers heretofore appointed, made out annual reports on printed forms prepared by the Interstate Commerce Commission in conformity with said Uniform System of Accounts, which were compiled in bound volumes. That a copy of each annual report was filed in the office of the Public Service Commission of the State of Indiana. That copies of said reports were delivered to trustees under the mortgages of said Company. That page 226 of the annual report for the year ending December 31, 1924, among other things contained the following: Name of Sub-account—Injuries and Damage Reserves—Character of Sub-account—Personal Injury, and Property Damage—$185,100.08. That said report, was a correct report, and statement as shown by the books of the company.

. Finding number (48) found that during the year 1924, said Traction Company expended $491,215.00, in payment of interest due to its mortgage creditors, intervening petitioners herein; that on December 31, 1924, the cash balance in the treasury of said Company was the sum of $51,372.68, and that on December 31, 1924, the credit balance in said Injuries and Damage Reserve Account was the sum of $185,100.08.

Finding number (55) found that as a natural, ordinary, and common incident to the operation of said business, and as a result of such operation, a great number of casualties, resulting in injury, and damage to various citizens, and members of the public and community, and to their property, resulted; and the claims, judgment, and demands for damages aforesaid were part of the ordinary, and common results of such operation, and that said results and said injuries occurred under such circumstances as to render, and cause said

defendant· to be, and become liable for damages and compensation to those sustaining said injuries and losses. That each, and all of said claims, demands, and judgments were based upon the operation of said business by the agents and employees of said defendant.

Finding number (57) found that defendant Traction Company of Indiana, is a public service corporation, and has ever since the year 1913, worked under the supervision of the Public Service Commission of the State of Indiana; and that in the year 1913, and from said time forward, the schedule of rates and charges for passenger, carriage, and freight hire, was upon the petition, and request of the said defendant Traction Company from time to time fixed, declared, and established by said Public Service Commission of the State of Indiana, pursuant to the rules, and regulations of said Public Service Commission.

Finding number (58) found that pursuant to and in performance of its duty under the law, said Public Service Commission did receive from said corporation in the year 1913, and from time to time thereafter, its reports of the cost and expense of the various items of operation, including the cost, and expense of damages for injury to person, and property, and did acquaint itself with the probable expense of said items, all with the knowledge, acquiesence and consent of said defendant; and did, upon the petition of said defendant Company, and within its authority as said Public Service Commission, fix and establish a rate of fares and charges to be used by the said defendant Traction Company, as and for its schedule of rates and charges, all at the solicitation and request of the said Traction Company. And said schedule of rates was accepted and adopted by said defendant Traction Company, and was adhered to and used and applied by it at all times and from time to

time up to the date of the appointment of the receiver herein on the 31st day of December, 1924.

Finding number (59) found that the defendant Company in the operation and conduct of said business ever after the establishment of rates by the said Public Service Commission, and establishment of said system of bookkeeping, paid all personal injury and property damage demands and liability as part and portion of the operating expense of said company, except the claims of the claimants herein, and now remaining unpaid, and charged the same against said account for personal injury, and property damage as so carried under said system of bookkeeping, and deducted the same from the account so set and carried in said system from time to time, and year to year . . . and included the same in the public reports made by it to said Public Service Commission, copies of which were furnished as aforesaid to the intervening petitioners herein. And that said defendant Company at all times, to the time of the appointment of said receiver, treated said personal injury, and damage claims, and demands as expense of operation of said business; and that ever since the appointment of said receiver under the order and direction of this court, the expense of personal injury, and property damage claims incurred by said receiver have been paid, and are now being paid as a part of the operation expense of said Company, and said receivership.

Upon the special finding of facts, the court stated three conclusions of law as follows:

(1) The liens of the several mortgages of the various Trust Companies, (the same being set out) are each valid, and subsisting liens upon property covered by said mortgages respectively, and each respect paramount and superior to the claims and demands of the claimants, (naming them).

(2) That the creditors listed in conclusion of law number (1), who have claims on account of injuries to persons, and property are general, unse-

cured creditors and not entitled to any preference or priority in payment over any other creditors of the same or different classes, but as such general creditors are entitled to share in any funds hereafter found applicable to the payment of general claims.

(3) That the rights and liabilities as among the several Mortgagee Trustees under the various mortgages, and deeds of trust hereinbefore to are not, as among themselves, to be affected by these findings and conclusions, but are reserved for future presentation to the Court, and its future determination.

The appellants contend that the lower court erred upon its conclusion of law to the facts found in the special finding of facts. The first contention of appellants is that Operating Expenses should be paid before mortgage debts, and that the term "Operating Expense," includes claims for injuries to persons, and damages to property arising out of the operation of the business as a public utility.

It is generally held that claims for personal injuries inflicted in the operation of railroads while in the hands of receivers are generally treated as expenses of receivership, and payable as other operating expenses. This is so because, the expenses of settling such claims are in fact operating expenses. *Farmers Loan & Trust Co.* v. *Northern Pac. R. Co.* (1895), 71 Fed. 245; *Brown* v. *Winterbottom* (1918), 98 Ohio 127, 120 N. E., 292. High on Receivers, 4th ed. p. 505.

If such claims are operating expenses of a railroad when operated by a receiver why are they not operating expenses before a receiver has been appointed? And if such claims have a preference, and priority over mortgage creditors when the railroad is in the hands of a receiver why should they not have a preference, and priority over the mortgage creditors prior to the appointment of a receiver, if they are part of the operat-

ing expense of the business? If there is no sound reason to make a distinction, or classification, then they should be placed on an equality, and treated alike.

In the case of *Farmers' Loan & Trust Co.* v. *Northern Pac. R. Co., supra,* the court said, p. 246: "Railroads can not be operated without incurring expense and liabilities for injuries accidentally inflicted. The laws of the country require that expenses in operating railroads, the liabilities arising from injuries committed in operation thereof, shall be paid; and he who takes a mortgage on a railroad does so with the knowledge that the railroad must be operated, and that its earnings must, so far as necessary, be absorbed in the payment of operating expenses, and discharging the burdens which the law places upon such property. Such burdens are alike incidental to such property when under mortgage as when unincumbered, and it is but fair to construe the mortgage as other contracts are construed, by giving effect to the manifest intention of the parties, in view of the consequences which they must have had in contemplation. Now, when men take a mortgage upon a railroad, and leave it in the control of the mortgagor, it is plain that they intend that the mortgagor shall operate it, and pay the wages of employees . . . and all legal *liabilities* resulting from operation, and that only the surplus earnings remaining after such necessary payments can be available for the payment of mortgage debts."

In the instant case the property of the Traction Company was left in the hands of the mortgagor by the mortgagees, "to manage and receive, receipt for, take, use, enjoy, and dispose of the rents, tolls, earnings, profits, revenues, and income thereof in the same manner, and with the same effect as if this indenture had not been made." There can be no question, but that the mortgagees intended that the Traction Company should operate the business as it had done prior to the time of the

giving of the mortgage. And in operating the road it was necessary to pay for labor, material, and all other legal liabilities resulting from the operating of the business. Among the legal liabilities in the operation of a railroad, is that of claims, and judgments for negligent injuries to persons, and property. In the operation of railroads, accidents, and injuries to persons, and property are unavoidable, and the payment and settlement of such claims must necessarily be considered as operating expense. And in the instant case the court found, in Finding (59), that the Traction Company at all times, up to the time of the appointment of the receiver, treated personal injury, and damage claims, and demands as operating expense, and since the appointment of the receiver, they have been considered as part of the operating expense.

The court in the case of *Farmers' Loan & Trust Co.* v. *Northern Pac. R. Co.,* further said, p. 247: "When the law awards compensation for an injury sustained by reason of the operation of a railroad negligently, and the negligence is that of a servant, which, under the rule of *respondeat superior,* makes the owner liable to render compensation, the debt is an operating expense, because it is a consequence of operation; and, so far as the railroad is concerned, it is unavoidable, for it is not possible to secure, in the service of any railroad, servants and agents entirely free from human infirmities; and the liability which the law creates in such a case is not inferior in merit to a debt arising out of a contract. Claims for personal injuries inflicted in the operation of railroads while in the hands of receivers are generally treated as expenses of receivership, and payable as other operating expenses. This is so because the expenses of settling such claims are in fact operating expenses, and if operating expenses, when they arise during the administration of a receiver, they are equally

operating expenses when the road is being managed by officers and agents of a corporation."

If claims for personal injuries are considered arising out of the operation of the business, and upon sound reason they must be so considered and it makes no difference whether before, or after the appointment of a receiver, and if the mortgagees take their mortgage with the knowledge, and intention that the operating expense of the business must first be paid, and that only the surplus earnings can be available for the payment of the mortgage debts, then the claims of the claimants in the instant case should be preferred the same as if they grew out of the operation of the road after the appointment of the receiver.

In the case of *Farmers' Loan & Trust Co.* v. *Kansas City W. & N. W. R. Co.* (1892), 53 Fed. 182, the court as a condition of appointing a receiver required the trustee to assent to the payment of claims prior to the satisfaction of outstanding bonds, and the decree of appointment provided for the payment of all debts for ticket, and freight balances, for work, labor, and materials . . . and all liabilities incurred in the transportation of freight, and passengers, including damages to person, and property, which had accrued since the execution of the mortgage, January 2, 1888. The court said, p. 183: "It appeared that some of these creditors were entitled to liens on the property, or parts of it, and all of them had the right to subject the income and earnings of the road to the payment of their debts by a proper proceeding for that purpose; for, while the mortgage may in terms give a lien upon the income, and earnings of the road, it is well settled that, until the mortgagee takes possession, or a receiver is appointed, the income and earnings belong to the company, and any judgment creditor may subject the same to the payment of his judgment." The court quotes from the case *Fosdick* v.

*Schall* (1878), 99 U. S. 235, 253, as follows: "The mortgagee has his strict rights which he may enforce in the ordinary way. If he asks no favors, he need grant none. But if he calls upon a court of chancery to put forth its extraordinary powers and grant him purely equitable relief, he may with propriety be required to submit to the operation of a rule which always applies in such cases, and do equity in order to get equity. The appointment of a receiver is not a matter of strict right. Such an application always calls for the exercise of judicial discretion; and the Chancellor should so mould his order that while favoring one, injustice is not done to the other."

It seems to the writer of this opinion that the greatest injustice would be done to the claimants in this case, to deny them the right they are asking, for the reason that their claims originated before the appointment of a receiver, and to allow claims, if there be any, of the same class, that originated immediately after the appointment of the receiver. There is no sound reason for the discrimination, although we admit there are cases to the contrary. In a sense the mortgagor becomes the agent for the mortgagees as long as the mortgagor is permitted to retain the property, and control and manage the same as if the mortgage had never been given. This thought is well expressed in the case of *Watts, Trustee* v. *Sweeney* (1890), 127 Ind. 117, 123, 26 N. E. 680. This was a case where a mortgage had been taken upon a locomotive engine. The court said: "When the mortgagee intrusts machinery of the character in controversy to the custody of the mortgagor for a long period of time, to be used by the mortgagor in operating the railroad, it will be presumed against the mortgagee, that all necessary repairs were contemplated, and the mortgagor was, in case of needed repairs, constituted the agent of the mortgagee in procur-

ing such repairs, and in such case equity gives the mechanic a lien for his services, and materials. The repairs add to the value of the property, and they are for the benefit of the mortgagee as well as the mortgagor." So in the instant case the mortgagees for years had intrusted the property covered by the mortgage to the mortgagor for his complete control and management. They knew that in the natural course of events damage to property, and injury to persons would be done by the negligence of the servants of the mortgagor in the operation and management of the Traction Company. They knew when they took their mortgage that railroads can not be operated, and managed over a long period of time, without damage to property, and injuries to persons. They also knew that it is the law of the land, that those damaged, and injured through the negligence of the railroad would be entitled to recover their damage whatever it may have been. And knowing all of these facts is it not sound reason to say that they took the mortgages with knowledge of the fact that the operating expenses of the road must be paid, and it must be conceded that such claims are considered operating expenses. The Traction Company, as shown by the findings, considered and treated all claims for property damage, and personal injury as expense of operation of its business. The mortgagees made no objection, as far as the evidence shows, to this manner of handling these claims, and it seems to us that it comes with poor grace at this time for them to contend that the claims of claimants should not be considered preferential.

Those cases which hold that claims, such as the ones in question should not be considered preferential are predicated upon the proposition that they are not based upon any consideration that inures to the benefit of the mortgage security—that they do not enhance the value of the property of the mortgagee, such as repairs and

improvements. It seems to us that this is a false basis. If they are operating expenses of the road, then the mortgagees accepted the mortgages with knowledge of the fact that such expenses must be paid, and hence it makes no difference whether the value of the security was enhanced or not.

*In re Arkansas Rate* (1911), 187 Fed. 290, 306, the court said: "It is also claimed, that complainants are not entitled to 'charge in the expense of operation the sums they paid for injuries to persons.' This claim can not be treated seriously. It is true, as claimed by counsel, 'that the people of Arkansas are not insurers of the risks of the railroad business; but, on the other hand, such accidents can not be wholly avoided, and, as there is no pretense that they were wilful or intentional on the part of the officials of the companies they must be considered as unavoidable risks of operation of the business.' "

The case of *Green* v. *Coast Line R. Co.* (1894), 97 Ga. 15, 24 S. E. 814, 33 L. R. A. 806 discusses the questions involved in the instant case. The court in that case held that: "By invoking equitable relief, such as the appointment of a receiver and the administration of the mortgaged property by equitable means and agencies, mortgagees submit themselves to do equity relatively to any creditor of the mortgagor who may rightly intervene in the foreclosure proceedings in which such relief is sought. Mortgages upon a railway and the income from the same, the mortgagor being left in possession, are, as to the income, whether produced before or after the appointment of a receiver in foreclosure proceedings, subject to be postponed in equity in favor of a claim for damages resulting from a tort committed by the mortgagor while and by reason of operating the railroad after the execution of the mortgage. The tort now in question consisting of negligence in running a

train upon the railway whereby damages accrued, and judgment therefor against the mortgagor having been obtained the mortgages were foreclosed or the receiver appointed, such damages, so reduced to judgment, should be regarded as operating expenses charged by the judgment upon income as against the mortgages and all their incidents. So long as such a charge is unsatisfied, the mortgagees can not justly and equitably divert income from its payment and take the benefit of such diversion, whether directly or indirectly."

For other cases on the proposition that claims for injuries to persons, and property are considered operating expenses see the following: 2 Guiding Principles (Spurr) 580; *In re Rochester* (N. Y.) P. U. R. 1915 A, 1095; *In re Quincy R. Co.* (Ill.) P. U. R. 1919 E. 390.

Finding number (32), found that on August 26, 1913, the Public Service Commission of Indiana entered an order permitting the Traction Company to follow the system, or classification of accounts prescribed for interurban and electric railroads by the Interstate Commerce Commission, and Finding number (33) found that on May 28, 1914, the Interstate Commerce Commission prescribed a uniform system of accounts for electric railroads, effective July 1, 1914, which system has been in force and effect since said date. Section 92 relates to Injuries and Damages. This account includes expenditures on account of persons killed or injured, and property damaged. Section 442 relates to Operating Reserves. This account includes the balances representing reserves created by charges to Operating Revenues, or to Operating Expenses to provide for overcharge personal injury, loss and damage and other claims. The court further found in Finding number (34) that on December 31, 1924, at the time of the appointment of the receiver, there remained a credit balance in Injuries and Damages Reserve Account

of $185,100.08. Finding number (42) shows that a schedule of rates and fares was fixed and established by the Public Service Commission of Indiana, to be charged by the Traction Company, and that during the years 1922, 1923, 1924, 1925 and 1926 the Traction Company, by its officers and its receiver, credited a sum equal to two and three-quarters per cent of its gross earnings to Injuries and Damage Reserve Account. The Traction Company made annual reports on printed forms prepared by the Interstate Commerce Commission, and a copy of each annual report was filed with the Public Service Commission of Indiana, and copies were delivered to the trustees under the mortgages of said company. In the annual report for the year ending December 31, 1924, there was a credit balance as shown in the report for Personal Injury and Property Damage the sum of $185,000.08. During the period of time between December 31, 1924 and June 19, 1925, there was, after paying operating expense, as shown in Finding (45), an income amounting to $190,732.46. It further appears from Finding 48, that during the year 1924 the Traction Company expended $491,215.00 in payment of interest due its mortgage creditors. It further appears from Finding 58, that the Public Service Commission received from the Traction Company in the year 1913, and from time to time thereafter, its reports of the cost and expense of the various items of operation, including the cost and expense of damages for injury to persons and property, and upon the petition of said Traction Company, the Public Service Commission fixed and established a rate of fares and charges to be used by said company. Said rates were accepted and adopted by said company and were adhered to and used, and applied by it at all times up to the date of the appointment of the receiver on December 31, 1924.

It is found in Finding (34) that neither the Traction

Company nor its receiver has at any time had any fund, money, property, or assets of any kind or character representing said Injuries and Damage Reserve Account, or segregated, or set apart for such purpose, but that said account is hereinbefore found, is purely a bookkeeping account, and is required to be kept for the purpose of estimating the liabilities which will be incurred by the Traction Company and its receiver on account of damages to persons and property; that the payments made by the Traction Company and its receiver in discharge of such liabilities have always been made out of the current general assets, and funds of said receivership, and thereafter charged as a matter of bookkeeping to said account, and that the payment of such liabilities has been on the same identical basis as that of other general indebtedness, and expenditures of said Traction Company. And the court further found that the method of bookkeeping prescribed by the Interstate Commerce Commission for said Injuries and Damage Reserve Account is merely a bookkeeping method, and that the adoption of the same by the Traction Company did not result in the creation of any fund to which persons claiming damages on account of injuries to their persons or property have any right to resort or to which they have any claim of any kind or character.

We can not agree to the proposition that the rules prescribed by the Interstate Commerce Commission is merely a bookkeeping method. Regardless of the "Uniform System of Accounts," it has been held, and we believe correctly, that a railway mortgagee, in accepting his mortgage, impliedly agrees that the current "operating expenses," made in the ordinary course of business, are to be paid from the current revenues before the mortgagee has any claim on such income. It is said in *Citizens Trust Co.* v. *National Supply Co.* (1912), 178 Ind. 167, 172, that ". . . 'every rail-

road mortgagee in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income.' " See also *Fosdick* v. *Schall, supra.* It was also said in the above case of *Citizens Trust Co.* v. *National Supply Co.,* ". . . that if, for temporary convenience or necessity, money is taken from the current debt fund and put into that which belongs to the mortgage creditors, a court of equity, when asked by the mortgagees to take possession of the future income, through the appointment of a receiver, and hold it for their benefit, may require, as a condition to granting such relief, that what is due from the earnings to the current debt fund shall be paid by the court from future current receipts, before anything from that source shall be paid to the mortgagees.

"On the same principle, if the mortgagees demand a foreclosure of the mortgage and sale of the property, and thus deprive the court of the power to restore to the current debt fund the money diverted therefrom for the betterment of the property covered by the mortgage lien, a court of equity will require, as a condition to granting such relief to the mortgagees, that the current debt fund shall be restored in like manner, by drawing on the proceeds of the sale."

Citing many cases on this proposition.

In the same case the court further said: "It may be regarded as a settled rule, as applicable to railway and similar *quasi*-public corporations, that where, within a reasonably short time before the appointment of a receiver, current earnings of the corporation have been diverted to the betterment of the mortgaged property, and in the meantime debts have been created for current supplies, materials and operating expenses, the latter constitute preferential claims which have priority over existing mortgage liens.

"Such debts are not, strictly speaking, liens on the trust property, but they are regarded, in equity, as demanding payment before the mortgagees are entitled to equitable relief." This case holds that "operating expenses" constitute preferential claims, and it must be conceded that the claims of the claimants herein are for "operating expenses."

The contention that the regulations prescribed by the Interstate Commerce Commission is merely a bookkeeping method is untenable. If the contention is true, then the system is absolutely meaningless and without substance. The regulation required that the Traction Company should set aside part of its current revenue or income for the payment of claims for injuries to presons and property. The company did this, and made and filed reports with the Public Service Commission of Indiana, and to the trustees under the mortgages of said company. The Traction Company from 1913 worked under the supervision of the Public Service Commission, and upon its petition the schedule of rates and charges were fixed and declared, and it held out to the commission, and to the public, that it was setting aside a fund for the purpose of taking care of such claims as the ones involved in the instant case. When the rates were fixed by the Public Service Commission, they were necessarily increased for the very purpose of meeting such claims as here involved and not for the benefit of the mortgagees, except as it might benefit the mortgagor, in the operation of the business, and thus indirectly benefit the mortgagees.

In Finding (42) the court found that from 1922 to 1926, inclusive, the Traction Company credited a sum equal to two and three-quarters per cent of its gross earnings to the "Injuries and Damage Reserve Account," and actual disbursements for injuries and damages were charged against said account. The mortgage trustees

and bondholders received copies of reports which were filed with the Public Service Commission, and to allow the mortgagees to take all the surplus income, as against the claimants herein, would be unjust, and inequitable, because the money rightfully belonged to the tort claimants, but was wrongfully used to pay interest on mortgage debts, and for the purchase of equipments and betterments.

In Findings 44 and 45 the court found that at the time of the appointment of the receiver, December 31, 1924, there was an actual cash balance of $51,372.67 in the general treasury of said company and that for and during the period of time between December 31, 1924, and June 19, 1925, Arthur W. Brady, as receiver, received a net income from operating said company in the sum of $190,732.46.

In Findings 48 and 50 the court found that the Company received operating revenues to the amount of $3,339,187.99, and paid for operating expenses $2,658,065.81, leaving a net operating income, less taxes of $477,122.18; that during the same year it paid to its mortgage trustees, appellees herein, for interest due on mortgage debts $491,215.00, leaving only $51,372.68 in its treasury on December 31, 1924, at which time the "Injuries and Damage Reserve" showed a credit balance of $185,100.08.

The claims filed herein amount to about $156,000.00. It is the law that the lien upon the earnings in favor of bond holders attaches only upon what is earned after the time when the lien is perfected by entry and possession.

In the case of *New York Security & Trust Co.* v. *Saratoga Gas & Electric Light Co.* (1899), 159 N. Y. 137, 140, 53 N. E. 758, 45 L. R. A. 133, we find the facts as far as the mortgage is concerned very much like the facts in the instant case. In that case there was the

following stipulation in the mortgage: "Until default occurs in some duty, or upon some covenant, agreement or promise of the Gas Company hereunder, said Gas Company, its successors and assigns shall retain the possession, control and enjoyment of all the property and franchises hereby mortgaged, and may receive and use the earnings, income and profits thereof in any manner not inconsistent with these presents, nor tending to lessen the security hereby provided." In the instant case the mortgage given to the Equitable Trust Co. of New York has the following provision: "So long as no default shall be made in the payment of the principal or interest . . . the Traction Company shall be permitted and suffered by the trustee to remain in full possession, enjoyment, and control . . . and shall be permitted to manage the same, and to receive, receipt for, take, use, enjoy, and dispose of the rents, tolls, earnings, profits and revenues, income thereof in the same manner and with the same effect as if this indenture had not been made . . . provided that the security of said bonds shall not thereby be in anywise reduced or impaired." It will be noted that these two provisions are practically the same. In the New York case, *supra*, the court said, p. 142: "The right of the mortgagor to deal with these products and earnings as its own under the stipulations of the mortgage has already been noticed. That right, it seems to me, is entirely inconsistent with the existence of any lien upon future products or earnings by the mortgagee. The latter could not have a lien upon such earnings or products while the mortgagor was permitted to use them for the conduct of its business and the payment of its current debts. We think that the true construction of the instrument is this: Where a mortgage by a corporation to secure the payment of the principal and interest of its bonds, such as this is, is made, although in terms purporting to

include future earnings and products, it does not, as against general creditors, operate as a lien upon such earnings until actual entry and possession under the mortgage by the mortgagee. This results from the stipulation in the instrument that until default the mortgagor shall have the use of the earnings in the conduct of its business, and that upon default the mortgagee may go into possession, exercise the corporate franchises and appropriate the earnings to the payment of the debt secured by the mortgage. The right of the mortgagor in the meantime to the use of the earnings, amounts, practically, to absolute ownership, and hence the mortgage can not operate as a lien upon such earnings to the prejudice of the general creditors until actual entry and possession taken, and then only upon what is earned after that time. . . . The lien upon the earnings, in favor of the bondholders, attaches only upon what is earned after the time when the lien is perfected by entry and possession. This is the construction which has been given to corporate mortgages, expressed in substantially the same terms, by the Supreme Court of the United States, by the English courts and by the highest courts of many of our sister states."

Many cases are cited on this proposition.

In the case of *U. S. Trust Co.* v. *Wabash Western Railway* (1893), 150 U. S. 287, 308, the court after reviewing a long line of cases of the Supreme Court of the United States says: "The substance of these rulings is that until the mortgagee asserts his rights under the mortgage to the possession of the road by filing a bill of foreclosure, or, if the road be in the hands of a third party, by demanding possession of such party, he has no right to its earnings and profits."

In the case of *Gilman* v. *Illinois* (1875), 91 U. S. 603, 617, the court said: "It is clearly implied in these mortgages that the railroad company should hold pos-

session and receive the earnings until the mortgagees should take possession, or the proper judicial authority should interpose. Possession draws after it the right to receive and apply the income. . . . In this condition of things, the whole fund belonged to the company, and was subject to its control. It was, therefore, liable to the creditors of the company as if the mortgages did not exist. They in no wise affected it. If the mortgagees were not satisfied, they had the remedy in their own hands, and could at any moment invoke the aid of the law, or interpose themselves without it."

The foregoing authorities undoubtedly declare the law to be that such mortgages as the one in the instant case can not operate as a lien upon the earnings of the company to the prejudice of general creditors until actual entry and possession take place, and then only what is earned after that time. The mortgagees can not have a lien upon the earnings and income while the mortgagor is permitted to use them for the conduct of its business, and the payment of its current debts. And among its current debts is the item of operating expense.

The appellees assert that the appointment of a receiver does not displace vested contract liens. This proposition is not controverted. The validity of the mortgage is not impaired nor the liens thereof displaced. The liens thereof still exist on the *corpus* but as the mortgagees took their mortgage with the understanding that all operating expense should first be paid out of the current earnings, their liens would only attach to the net income. So there can not be any question as to the invalidation of any contractual rights in this case and no such rights are violated. The mortgagees still have and retain all the rights which the mortgages gave them, but no more.

The Workmen's Compensation Act and other questions

have been presented in this case but, in view of the result we have reached, we deem it unnecessary to discuss them.

Under all the facts in this case, we are of the opinion that the claimants herein are entitled to payment out of the "Reserve for Injuries and Damages," and out of "surplus earnings" before the mortgage debts are paid; the two and three-quarters per cent in excess of the cost of operation allowed to be collected was for the very purpose of taking care of liabiilties for Injuries and Damages, and the credit balance in the reserve for Injuries and Damages amounted to $185,100.08, and the Traction Company and its receiver are now estopped from asserting the contrary.

Judgment reversed, and cause remanded to the trial court to restate its conclusions of law in favor of appellants.